STATE OF NORTH CAROLINA v. NORRIS TAYLOR, A/K/A TOM GATLING

No. 3

(Filed 6 November 1979)

1. **Criminal Law § 29.2— capacity of defendant to proceed—failure to order psychiatric examination or commitment before hearing**

   The trial judge did not err in failing to order that defendant be examined by medical experts or committed to a State mental facility for observation prior to holding the hearing mandated by G.S. 15A-1002 to determine defendant's capacity to proceed where there was no evidence presented at the hearing which would have caused a prudent judge to call for a psychiatric examination or commitment.

2. **Criminal Law § 29.1— capacity of defendant to proceed—constitutionality of statutory procedure**

   Due process does not require a trial judge automatically to order a psychiatric examination of a defendant any time a question is raised concerning defendant's capacity to proceed, and the procedure provided by G.S. 15A-1002 to determine a defendant's capacity to proceed is, on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent.

3. **Jury § 6— denial of examination of prospective jurors individually—refusal to sequester prospective jurors**

   The trial court in a first degree murder case did not abuse its discretion in refusing to sequester the venire while each prospective juror was examined individually or, in the alternative, to exclude all prospective jurors except the twelve currently under examination.

State v. Taylor

4. **Jury § 5— statements by prospective jurors not prejudicial—excusal of jurors—acceptance of one juror**

A remark made by a prospective juror on voir dire in the presence of other prospective jurors that when he read about the case in the newspaper he thought defendant was guilty and a remark by another prospective juror that she had formed an opinion and it would take some evidence to change her mind were harmless where both such jurors were excused either for cause or peremptorily. Furthermore, defendant cannot now complain that another prospective juror's comment about defendant being on escape was so inherently prejudicial as to require a new trial where defendant questioned such prospective juror further and accepted her as a juror when he could have challenged her for cause or peremptorily.

5. **Criminal Law § 135.3; Jury § 7.11— capital case—Witherspoon-qualified jurors**

There is no merit in defendant's contention that jurors not opposed to the death penalty are more apt to convict and tend to favor the prosecution in the determination of guilt and that a defendant in a bifurcated trial for first degree murder is denied due process when members of the jury are qualified pursuant to the standards of *Witherspoon v. Illinois*, 391 U.S. 510.

6. **Searches and Seizures § 15— motion to suppress—aggrieved person**

A defendant is "aggrieved" and "may move to suppress evidence" under G.S. 15A-972 only when it appears that his personal rights, not those of some third party, have been violated, and such defendant has the burden of establishing that he is an "aggrieved" party before his motion to suppress will be considered.

7. **Searches and Seizures § 15— no standing to object to search of "shot house"**

Defendant failed to establish that he had a privacy interest in the room at a "shot house" where his gun was found by officers sufficient to give him standing to object to the search of that room where the record shows only that defendant was present at the shot house, presumably to buy a drink, and hid his pistol in a small room there, and there was no evidence that defendant owned the shot house, that he leased, controlled or occupied the room as a paying guest, or even that he had permission to store his belongings in the room.

8. **Searches and Seizures § 7— arrest of defendant outside premises—search of premises for weapons—exigent circumstances**

After having caused defendant to exit a shot house where illegal liquor is sold and to submit to an arrest outside the premises, the strong possibility that the officers might be fired upon from the shot house constituted an "exigent circumstance" which made it reasonable for them to make a limited, protective sweep of the shot house, and the warrantless seizure of defendant's pistol and ammunition from a small room in the shot house was lawful.

Justice BROCK did not participate in the consideration or decision of this case.

State v. Taylor

DEFENDANT appeals from judgment of *Hobgood, J.*, 25 September 1978 Session, JOHNSTON Superior Court.

Defendant was tried upon a bill of indictment charging him with the first degree murder of Kathiline Ann Mansullo, also known as Kathi King, on 2 January 1978 in Johnston County.

The state's evidence tends to show that defendant was the maintenance man at the Save Inn in Selma. He was on duty at and after 11 p.m. on 2 January 1978. Around 11:30 p.m. Kathiline Mansullo, or Kathi King, checked in at the motel and was assigned to Room No. 157. She paid for occupancy by one person. Several minutes later defendant and the night clerk saw a male person slip into her room. When she had occasion to enter the lobby soon thereafter, the night clerk, James Larry Brown, indicated his knowledge that a second occupant was in the room and stated it would be all right to pay for the extra person the next morning. Defendant Taylor, however, insisted that she pay immediately. The victim told defendant she would call police if he continued hassling her. An argument ensued. The night clerk dissuaded defendant and told him several times that if the second occupant spent the night there, it would be satisfactory to pay for the extra person the following morning. Nevertheless, the argument intensified and the victim told defendant, "I don't do anything that a filthy nigger tells me to do." As she turned to leave through the lobby door, defendant drew his gun and shot her twice. Miss Mansullo fell out the door. She was lying feet toward the door with her head toward the driveway. Defendant went to the doorway and shot her three more times as she lay on the ground. He reentered the lobby area, waved the gun at the night clerk and told him not to call the police. Miss Mansullo died from the gunshot wounds inflicted by defendant.

The jury convicted defendant of murder in the first degree. At the sentencing phase of the trial, no new evidence was presented. The jury found one aggravating and one mitigating circumstance and found that the aggravating circumstance was sufficient to call for imposition of the death penalty, finding beyond a reasonable doubt that the mitigating circumstance was insufficient to outweigh the aggravating circumstance. Despite these findings, however, the jury recommended life imprisonment and

State v. Taylor

judgment was pronounced accordingly. Defendant appealed, assigning errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by W. A. Raney, Jr., Special Deputy Attorney General; Daniel C. Oakley and Jo Anne Sanford, Assistant Attorneys General, for the State.*

*James B. Etheridge, attorney for defendant appellant.*

HUSKINS, Justice.

[1]   By his first assignment of error defendant contends the trial court erred in failing to commit defendant for a psychiatric examination prior to holding a hearing to determine defendant's capacity to proceed as mandated by G.S. 15A-1002. That statute provides in relevant part:

"(a) The question of the capacity of the defendant to proceed may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court. The motion shall detail the specific conduct that leads the moving party to question the defendant's capacity to proceed.

(b) When the capacity of the defendant to proceed is questioned, the court:

(1) May appoint one or more impartial medical experts to examine the defendant and return a written report describing the present state of the defendant's mental health. Reports so prepared are admissible at the hearing and the court may call any expert so appointed to testify at the hearing. In addition, any expert so appointed may be called to testify at the hearing by the court at the request of either party.

(2) May commit the defendant to a State mental health facility for observation and treatment for the period necessary to determine the defendant's capacity to proceed. In no event may the period exceed 60 days. The superintendent of the facility must direct his report on defendant's condition to the defense attorney and to the clerk of superior court, who must bring it to the attention of the court. The report is admissible at the hearing.

a. If the report indicates that the defendant lacks capacity to proceed, proceedings for involuntary civil commitment under Chapter 122 of the General Statutes may be instituted on the basis of the report in either the county where the criminal proceedings are pending or in the county in which the defendant is hospitalized.

b. If the report indicates that the defendant has capacity to proceed, the clerk must direct the sheriff to return him to the county.

(3) Must hold a hearing to determine the defendant's capacity to proceed. If examination is ordered pursuant to subdivision (1) or (2), the hearing must be held after the examination. Reasonable notice must be given to the defendant and to the prosecutor and the State and the defendant may introduce evidence."

It is obvious from the language of the statute itself that the provisions of (b)(1) and (2) are permissible and discretionary whereas the langugage of (b)(3), requiring a hearing to determine defendant's capacity to proceed, is mandatory. The record reveals that the able trial judge, in accordance with G.S. 15A-1002(b)(3), conducted a pretrial hearing, found facts, and concluded that defendant had the mental capacity to proceed to trial. That conclusion is supported by the findings and the findings are supported by the evidence adduced at the hearing.

We note that defense counsel's motion suggesting defendant's incapacity to proceed did not "detail the specific conduct that [led] the moving party to question the defendant's capacity to proceed." G.S. 15A-1002(a). Rather, defense counsel generally argued that defendant's lengthy criminal record and several statements defendant had made to him had led him to conclude that defendant might not be able to stand trial. Moreover, defendant, in response to questioning from the trial judge, showed himself to be mentally alert and ready to go on with the trial. Finally, the district attorney stated that defendant had been cooperative in his interviews with police officers and "had related the details and the facts of the incidents under investigation very clearly to the officers. . . ." In summary, there was no evidence presented at the pretrial hearing which should

have caused a prudent judge to call for a psychiatric examination or commitment. Accordingly, denial of defense motions for examination or commitment, or both, under G.S. 15A-1002(b)(1) and (2) was entirely proper, and the trial judge did not abuse his discretion in determining that further psychiatric testing was unnecessary. The correctness of this determination was confirmed by defendant's subsequent disruptive behavior during the trial, which said more about his capacity for deliberate mischief than his incapacity to proceed.

[2] Defendant nevertheless contends that the trial court's failure to order a psychiatric examination per se deprived him of a fair trial and amounted to a denial of due process in that it failed to adequately protect his right not to be convicted while incompetent. Essentially, defendant argues that due process requires a trial judge to automatically order a psychiatric examination any time a question is raised concerning defendant's capacity to proceed. This contention is without merit. It is well established, of course, that the conviction of an accused person while he is legally incompetent violates due process and that state procedures must be adequate to protect this right. *Drope v. Missouri*, 420 U.S. 162, 43 L.Ed. 2d 103, 95 S.Ct. 896 (1975); *Pate v. Robinson*, 383 U.S. 375, 15 L.Ed. 2d 815, 86 S.Ct. 836 (1966). However, the United States Supreme Court has never held any particular procedure, such as the one advanced by defendant, to be constitutionally mandated for the protection of a defendant's right not to be tried or convicted while incompetent to stand trial. *See Drope v. Missouri, supra,* 402 U.S. at 172. Rather, the Court has generally indicated that in order to comport with due process, the procedure utilized must "jealously guard" a defendant's right to a fair trial. *Drope v. Missouri, supra; Pate v. Robinson, supra.*

Due consideration of North Carolina's statutory scheme for determining a defendant's capacity to proceed leads us to conclude that it "jealously guards" a defendant's right to a fair trial. The question of defendant's capacity "may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court." G.S. 15A-1002(a). When defendant's capacity to proceed is questioned, the court *"[m]ust* hold a hearing to determine the defendant's capacity to proceed." G.S. 15A-1002(b)(3). (Emphasis added.) Defendant may introduce evidence at this hearing. *Id.* Prior to holding a mandatory hearing the court may, in its

discretion, order defendant to be examined by medical experts or committed to a State mental facility for observation. G.S. 15A-1002(b)(1) and (2). The above procedure is, on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent. Defendant's first assignment of error is overruled.

[3] The trial court refused to sequester the venire while each prospective juror was examined individually or, in the alternative, to exclude all prospective jurors except the twelve currently under examination. The ruling of the court in this respect constitutes defendant's second assignment of error.

So long as the defendant's rights are scrupulously afforded him, all matters relating to the actual conduct of a criminal trial rest largely in the sound discretion of the trial judge. *State v. Perry*, 277 N.C. 174, 176 S.E. 2d 729 (1970). Thus, a motion to examine jurors individually rather than collectively is addressed to the discretion which the trial court possesses for regulating the jury selection process. *State v. Jarrette*, 284 N.C. 625, 202 S.E. 2d 721 (1974), *death sentence vacated*, 428 U.S. 903 (1976). Here, the jury was selected in the manner heretofore approved by this Court in many cases, including those cited in *State v. Young*, 287 N.C. 377, 214 S.E. 2d 763 (1975), *death sentence vacated*, 428 U.S. 903 (1976).

[4] In his brief, defendant concedes that the trial court did not abuse its discretion in denying his motions concerning the sequestration of prospective jurors. He strongly insists, however, that at least three prospective jurors expressed their opinions, based upon what they had heard and read, that defendant was guilty. Since those remarks occurred in the presence of the other prospective jurors, defendant contends he was prejudiced, especially in view of the fact that no curative instruction was given. He relies on *State v. Finch*, 293 N.C. 132, 235 S.E. 2d 819 (1977). In *Finch*, two prospective jurors stated on voir dire in the presence of the remainder of the venire that, based upon what they had read or heard, it was their opinion that defendant was guilty. The trial judge excused those two jurors and instructed the other members of the venire not to consider the remarks. We held that any prejudice was thereby cured.

In the case before us, venireman Smith was asked by defense counsel if he had an opinion as to defendant's guilt or innocence, and Mr. Smith replied: "What I have read in the paper — when I read it in the paper I thought he was guilty."

Mrs. Barnes on her voir dire examination by defense counsel said she had read about the case in the newspaper, heard about it on television, and said it was very hard not to form an opinion. She said it would take some evidence at this time to change her mind and she would have a hard time giving defendant a fair and impartial trial.

Mrs. Hadsell, when asked whether she had heard anything about the case, replied: "The only time I can remember actually hearing anything on the radio was when he had escaped and that is all I heard because I am in a position where — I am working most of the time and I don't hear anything much."

Curative instructions were not requested and none were given. No objection was lodged at the time, and defendant seems to have attached no particular significance to the matter until he made up the record on appeal.

The record on appeal reveals that (1) defendant excused Mr. Smith, whether peremptorily or for cause does not appear, and (2) defendant challenged Mrs. Barnes for cause and the court excused her. The record is silent as to Mrs. Hadsell. However, we have examined the Voir Dire on Jury Selection (Exhibit A), not a part of the record on appeal but filed with the Clerk. This Exhibit reveals that defense counsel continued to interrogate Mrs. Hadsell after her comment which is now under challenge, and elicited answers indicating that she had an open mind, belonged to the church, did not feel obligated to vote for the death penalty merely because the district attorney was seeking it, and had the free option, if defendant was found guilty, to vote for either death or life imprisonment. Following such examination, counsel stated "we are satisfied," and Mrs. Hadsell was duly sworn and empaneled as a member of the jury. Defendant, having posed no objection at the time, and having freely accepted Mrs. Hadsell as a juror when he could have challenged her for cause or, if necessary, peremptorily, may not now be heard to complain that her comment about defendant being on escape was so inherently prejudicial as to require a new trial.

We hold that the remarks by prospective jurors Smith, Barnes and Hadsell were entirely harmless and could not have prejudiced defendant's right to a fair trial. Our conclusion is reinforced by the fact that the trial judge in his charge admonished the jury, among other things, ". . . to decide the case solely upon the evidence presented in the courtroom. . . ." It is clear beyond a reasonable doubt that the statements were harmless. Defendant's second assignment of error is overruled.

[5] By his third assignment of error defendant seeks an answer to the following question: "Where both stages of a bifurcated trial for first degree murder are tried to the same jury and the members of that jury are qualified on voir dire for jury selection pursuant to *Witherspoon* standards, is the defendant deprived of due process under the Sixth and Fourteenth Amendments to the United States Constitution even though, upon conviction as charged, the jury recommends life imprisonment?" Defendant argues that jurors not opposed to the death penalty are more apt to convict and thus tend to favor the prosecution in the determination of guilt. However, defendant neither objected nor excepted to any ruling of the trial court which could constitute the basis for this assignment of error.

To be effectual, assignments of error must be based on exceptions duly noted at trial to rulings of the trial court. *State v. Ferebee*, 266 N.C. 606, 146 S.E. 2d 666 (1966); *State v. Mallory*, 266 N.C. 31, 145 S.E. 2d 335 (1965), *cert. denied*, 384 U.S. 928 (1966); *State v. Worley*, 246 N.C. 202, 97 S.E. 2d 837 (1957); *State v. Taylor*, 240 N.C. 117, 80 S.E. 2d 917 (1954); Rule 10, Rules of Appellate Procedure. Furthermore, exceptions which appear for the first time under a purported assignment of error will not be considered. *Dilday v. Bd. of Education*, 267 N.C. 438, 148 S.E. 2d 513 (1966). *See* 1 N.C. Index 3d, Appeal and Error, §§ 24, 24.1.

The question which defendant attempts to raise by his third assignment was properly presented in *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), and decided adversely to defendant's contentions here. Many cases in accord with *Cherry* include *Witherspoon v. Illinois*, 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968); *State v. Madden*, 292 N.C. 114, 232 S.E. 2d 656 (1977); *State v. Phifer*, 290 N.C. 203, 225 S.E. 2d 786 (1976), *cert. denied*, 429 U.S. 1123 (1977); *State v. Bock*, 288 N.C. 145, 217 S.E. 2d 513

(1975), *death sentence vacated,* 428 U.S. 903 (1976). There is no evidence in this case — none whatever — to support the argument that a *Witherspoon*-qualified jury tends to favor the prosecution in the determination of guilt, or precludes the selection of a jury from a representative cross-section of the community, or denies defendant the equal protection of the laws. Defendant's third assignment of error is without merit.

Finally, defendant contends the search by the Hampton, Virginia police and seizure of the murder weapon violated his Fourth Amendment rights to be free from unreasonable searches and seizures. He does not dispute the existence of probable cause but asserts the search was unreasonable because it was warrantless. Admission of the pistol seized in the search constitutes his fourth assignment of error.

The record discloses that defendant was wanted for a robbery and maiming that had occurred in the City of Hampton, Virginia. The officers had information that defendant was in a house at 34 Lancer Street in Hampton. "It was a shot house."[1] Some twenty to thirty officers surrounded the house about 8 p.m. on the night of 4 January 1978, and defendant was adivsed by a loud speaker to come out with his hands up. Defendant did so, identitifed himself as Norris Taylor, and Officer Allen frisked him. The officer found no weapon but feared for his own safety. "[W]e did not know if there was anyone else in the house or if, in fact, this was Norris Taylor or exactly what." He asked defendant "where his weapon was," and defendant stated it was "in the house." What then transpired is narrated by Officer Allen on a voir dire examination as follows: "I asked him to show me where the pistol was. I escorted him back into the house with him in front of me. We went right in the door. He led me right up the flight of stairs to a small room at the front of the house. He pointed down at the floor, took some clothing or rags from off the floor, and concealed underneath these rags was the pistol and twenty-nine rounds of ammunition. There were six rounds in the pistol and then loose rounds lying in the floor. I placed Norris Taylor under arrest for robbery and maiming that had occurred in the City of Hampton. These were Virginia charges."

---

1. On oral argument of this case, defense counsel stated that a "shot house" is a house where liquor by the drink is illegally sold.

"The immunity to unreasonable searches and seizures is a privilege personal to those whose rights thereunder have been infringed. They alone may invoke it against illegal searches and seizures." *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25 (1967). *Accord, Jones v. United States,* 362 U.S. 257, 261, 4 L.Ed. 2d 697, 702, 80 S.Ct. 725, 731 (1960). Thus, a defendant may not object to the introduction of evidence which has been obtained in violation of the rights of some third party. Only those defendants whose *personal* rights have been infringed by an allegedly illegal search have standing to object to the introduction of evidence obtained as a result of that search. Moreover, it is well settled that the burden is on defendant to establish standing. *Jones v. United States, supra;* 3 W. LaFave, Search and Seizure, § 11.2 at 501 (1978).

The case law as to standing, summarized above, has been incorporated into G.S. 15A-972 which provides:

"When an indictment has been returned or an information has been filed in the superior court, or a defendant has been bound over for trial in superior court, a defendant *who is aggrieved* may move to suppress evidence in accordance with the terms of this Article." (Emphasis added.)

The Official Commentary to G.S. 15A-972 notes that the word "aggrieved" is the same word used in Rule 41(e), Federal Rules of Criminal Procedure, to describe those persons who have standing. The word "aggrieved" is utilized to "give North Carolina the benefit of case law as to standing developed in the federal courts and in the courts of many other states which use the same terminology."

[6] We note that *Jones v. United States, supra,* which defines standing in accord with *State v. Craddock, supra,* and places the burden on defendant to establish standing, was decided under Rule 41(e), Federal Rules of Criminal Procedure. Taking the discussion of standing in *Jones* and *Craddock* as our guide, we hold that a defendant is "aggrieved" and "may move to suppress evidence" under G.S. 15A-972 only when it appears that his *personal* rights, not those of some third party, may have been violated, and such defendant has the burden of establishing that he is an "aggrieved" party before his motion to suppress will be

considered. Thus, before defendant may challenge the legality of the instant search, he must demonstrate that the room in the shot house where the search occurred was an area in which he had a reasonable expectation of privacy. *See State v. Alford,* 298 N.C. 465, 259 S.E. 2d 242 (1979).

[7]   Review of the record in this case leads us to conclude that defendant has failed to establish that he had a privacy interest in the room at the shot house where his gun was found sufficient to give him standing to object to the search of that room. The record fails to indicate what privacy interest, if any, defendant had in the room that was searched. There is no evidence that defendant owned the shot house, that he leased, controlled or occupied the room as a paying guest at the shot house, or even that he had permission to store his belongings in the room. The record shows only that defendant was present at the shot house, presumably to buy a drink, and hid his pistol and ammunition in a small room there. This showing is insufficient to confer standing upon defendant to invoke the constitutional immunity of the Fourth Amendment with respect to the search and seizure challenged by this assignment.

[8]   Independent of the question of standing, we note that the Hampton officers were justified by exigent circumstances in making a limited, warrantless search of the shot house and in seizing the pistol.

"The Constitution does not prohibit all searches but only those which are unreasonable." *State v. Colson,* 274 N.C. 295, 163 S.E. 2d 376 (1968), *cert. denied,* 393 U.S. 1087 (1969). An unreasonable search has been defined as an unauthorized search of a person or a person's premises with a view to the discovery of some evidence of guilt, to be used in the prosecution of a criminal action. *Id.* A warrantless search of a dwelling following an arrest outside the dwelling will be upheld where the circumstances provide the arresting officers with reason to believe that a serious threat to their safety is presented. *McGeehan v. Wainwright,* 526 F. 2d 397 (5th Cir.), *cert. denied,* 425 U.S. 997 (1976). Where the facts disclose a "high potentiality for danger" surrounding an arrest made outside a dwelling, an entry into the dwelling is permissible for the limited purpose of making a cursory safety check, even though the arrest itself was achieved without entry. *United*

*States v. Smith,* 515 F. 2d 1028 (5th Cir. 1975), *cert. denied,* 424
U.S. 917 (1976); *United States v. Looney,* 481 F. 2d 31 (5th Cir.),
*cert. denied,* 414 U.S. 1070 (1973). The immediate need to ensure
that no one remains in the dwelling preparing to fire a yet un-
found weapon at the arresting officer as he leaves the scene of
the arrest with arrestee constitutes an exigent circumstance
which makes it reasonable for the officer to conduct a limited,
warrantless, protective sweep of the dwelling. *Hopkins v.
Alabama,* 524 F. 2d 473 (5th Cir. 1975); *Banks v. State,* --- Nev.
---, 575 P. 2d 592 (1978); *People v. Olajos,* 397 Mich. 629, 246 N.W.
2d 828 (1976); 2 W. LaFave, *supra,* § 6.4 at 427-31.

The circumstances in this case indicate that even though
defendant had been arrested outside the shot house, the officers
had good reason to question "whether they [could] withdraw from
the area with their prisoner without being fired upon." 2 W.
LaFave, supra, § 6.4 at 431. The officers knew that an armed and
dangerous fugitive, wanted for murder in North Carolina and for
robbery and maiming in Virginia, was inside the shot house.
Moreover, the darkness and the nature of the place, *i.e.,* a shot
house where liquor by the drink is illegally sold, amplified the ap-
prehension of danger. Recognizing these hazards, the police did
not attempt to enter the premises in order to make the arrest;
rather, they took steps to cause the suspect to exit the premises
and submit to arrest outside.

Once defendant had been arrested, the officers had good
reason to fear for their safety. In the first place, the officers "did
not know if there was anyone else in the house, or if, in fact, this
was Norris Taylor or exactly what." Additionally, defendant's
weapon had not been accounted for. Given the strong possibility
of an ambush or "set up," it was eminently reasonable for the
police to make a limited protective sweep of the premises in
order to recover defendant's weapons and to ensure there was no
one in the house who could fire on them while they withdrew
with defendant.

Review of the record indicates that the entry into the shot
house was made for the sole purpose of ensuring the safety of the
officers and was not used as a pretext for uncovering evidence of
a crime. The scope of the search undertaken was no greater than
necessary to ensure the officers a safe withdrawal from the scene

of the arrest. Defendant informed Officer Allen that his pistol was inside the house and agreed to show him where the pistol was. Officer Allen then escorted defendant into the house. Defendant led the officer up a flight of stairs to a small room where his pistol and ammunition were hidden. Officer Allen, accompanied by defendant, left the house immediately after recovering defendant's pistol and determining that the shot house posed no further threats to safety.

In summary, the strong possibility that the officers might be fired upon from the shot house constituted an "exigent circumstance" which made it reasonable for them to make a limited, protective sweep of the shot house. Since the gun and ammunition were seized pursuant to a lawful search of the shot house, it follows that they were properly admitted into evidence. Defendant's fourth assignment of error is overruled.

The remaining assignments of error are not presented and discussed in defendant's brief and are therefore deemed abandoned. Rule 28, Rules of Appellate Procedure.

For the reasons stated the verdict and judgment must be upheld.

No error.

Justice BROCK did not participate in the consideration or decision of this case.