STATE OF NORTH CAROLINA v. JAMES THOMAS JONES

No. 90

(Filed 1 February 1980)

1. **Searches and Seizures § 20— search warrant—sufficiency of affidavit**

    The affidavit upon which a search warrant is issued is sufficient if it supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated criminal offense will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender.

2. **Searches and Seizures § 21— affidavit for warrant—hearsay**

    The affidavit for a search warrant may be based on hearsay information if the magistrate is informed of underlying circumstances upon which the informant based his conclusion as to the whereabouts of the articles and the underlying circumstances upon which the officer concluded that the informant was credible.

State v. Jones

**3. Searches and Seizures § 23— sufficiency of affidavit for search warrant**

An SBI agent's affidavit was sufficient to establish probable cause for the issuance of a warrant to search the house, barn and garage of defendant's parents for a hatchet and welder's gloves where it alleged that a murder victim's body was found in a certain location in South Carolina; defendant and a companion were arrested for the murder; the companion gave oral and written statements detailing his and defendant's participation in the murder; the companion accompanied officers to the crime scene on the banks of a river in North Carolina where a pipe used in the murder and other items were recovered; the companion told officers that defendant wore welder's gloves at the time of the murder and also used a hatchet in the killing; the companion showed officers an area behind the victim's residence where the body was kept for a week before it was taken to South Carolina; and the companion stated that the defendant owned the hatchet and welder's gloves and kept them either in the garage workshop or in the house of his parents.

**4. Searches and Seizures § 23— probable cause for search warrant—staleness of information**

Probable cause for the issuance of a warrant to search the home and garage of defendant's parents for a hatchet and welder's gloves used in a murder was not dissipated by the passage of some five months between the time an informant last saw defendant's hatchet and welder's gloves and the date the informant told officers of the whereabouts of those items since the hatchet and welder's gloves were not particularly incriminating in themselves and were of enduring utility to defendant, and the affidavit indicated that defendant normally kept such items either in his parents' home or in a garage workshop behind his parents' home.

**5. Searches and Seizures § 15— standing to object to search and seizure**

Defendant failed to establish standing to object to the seizure of a hatchet and welder's gloves from his parents' garage where he asserted neither a property nor a possessory interest in the garage and made no showing of any other circumstances giving rise to a reasonable expectation of privacy in the premises searched.

**6. Criminal Law § 34.7— evidence of other crimes—competency to show motive**

In a prosecution for first degree murder, evidence that defendant and the victim had been jointly involved in certain thefts of tobacco and cars was properly admitted to show that defendant's motive for killing the victim was that he thought the victim was "talking too much" and he was afraid the victim would "tell them everything" when he went to court on two drunk driving charges.

**7. Criminal Law § 135.4— first degree murder—aggravating circumstances—no authority to impose life imprisonment without sentencing hearing**

In a prosecution for first degree murder in which the jury could have found at least one aggravating circumstance beyond a reasonable doubt, the presiding judge, district attorney and defense counsel had no legal authority whatsoever (1) to announce that the State would not seek the death penalty, (2) to agree to make no motions concerning the death penalty, (3) to eliminate

voir dire examinations of jurors with respect to the death penalty, (4) to eliminate the separate sentencing proceeding to determine whether the punishment should be death or life imprisonment, or (5) by consent to fix the punishment at life imprisonment should the jury convict defendant of murder in the first degree.

DEFENDANT appeals from judgment of *Brewer, J.,* 9 April 1979 Criminal Session, CUMBERLAND Superior Court.

Defendant was tried upon a bill of indictment, proper in form, charging defendant with the first degree murder of Glenn Currie Gibson on 30 March 1978 in Cumberland County. When arraigned defendant pled not guilty and a jury was duly selected and empaneled.

The State's evidence tends to show that prior to the events surrounding the murder of Glenn Gibson, defendant and Gibson had been jointly involved in certain thefts of tobacco and automobiles. Approximately two weeks prior to Glenn Gibson's death, defendant told David Odom, a witness for the State, that Gibson "was getting drunk and was running off at the mouth bragging about things and that he was supposed to go into court for two (2) charges of DUI [driving under the influence]; and Jones was scared that if Gibson went to court, he would talk and tell them everything. Jones stated he wasn't going to pull time for anybody getting drunk and running off at the mouth." At that time defendant told Odom of a plan to kill Gibson by rendering him unconscious and placing him on a railroad track but that plan was never carried out.

On 30 March 1978, defendant, David Odom and Glenn Gibson went fishing in a remote area of the Cape Fear River. Defendant drove to the fishing site in his own vehicle and David Odom drove Gibson's car accompanied by Gibson. They fished along the river until 8-8:30 p.m. and then returned to their cars and prepared to leave for home. Gibson, however, was unable to start his car. As Gibson and Odom searched the trunk of Gibson's car for a piece of wire so he could "straight wire" the car, defendant struck Gibson in the back of his head with a length of pipe which was two and one-half inches in diameter. Gibson's knees buckled and defendant struck him twice more with the same piece of pipe. Defendant then laid the pipe down, went to this truck and obtained a hatchet, placed a piece of tablecloth over Gibson's head and then struck

Gibson in the left temple three to five times with the back side of the hatchet. During this entire episode defendant wore high-top welder's gloves. After he had killed Gibson, defendant threw the pipe into the river, raked the bloody dirt into a plastic bag, wrapped the body in a piece of cloth, tied the cloth with rope and placed it in the trunk of Gibson's car. Defendant then placed the hatchet in the trunk of his own vehicle, went to the front of Gibson's car, twisted two wires together and told Odom to crank the car. "This took him less than half a minute, and the car started right up." Defendant and Odom then drove back to Gibson's house where they planned to "drop a car" on the body so as to make it appear that Gibson had been killed in an accident while working on the car. This plan was interrupted, however, when Gibson's family returned home unexpectedly. So, rather than risk discovery, defendant and Odom simply left the body under a wrecked car there on the premises. They left the Gibson property and Odom scattered the blood-soaked rope, dirt, blanket and cloth in a wooded area.

About one week later defendant told Odom that defendant's father and mother had signed a $25,000 appearance bond for Gibson conditioned on his presence at trial for driving under the influence of intoxicants. To prevent a forfeiture of this bond defendnt said it was necessary that the authorities discover Gibson's body. Defendant and Odom therefore removed the body from beneath the wrecked car and hid it along I-95 in South Carolina where it remained for approximately one month. Defendant decided the authorities were not likely to find the body and told Odom to call the South Carolina Highway Patrol and tell them where a body might be found along I-95. Guided by the information thus furnished, the highway patrol soon discovered the body and it was later identified as the body of Glenn Gibson.

David Carl Odom was later arrested and made a statement to the police as a result of which defendant was arrested. Based on the information furnished by Odom, the officers also obtained a search warrant to search defendant's truck and to search his father's house including the barn and garage. A search was carried out and Officer Connerly found an army hatchet and welder's gloves in the garage on defendant's father's property. The State's evidence tends to show that defendant used that garage as an automobile workshop and stored all his tools there. Odom iden-

tified the hatchet as the one used by defendant to bludgeon Gibson. Laboratory analysis, however, revealed no evidence of blood on either the hatchet or the gloves.

David Carl Odom informed the jury that his attorney had made a plea bargain with the district attorney by the terms of which Odom agreed to testify truthfully and the State agreed to drop all charges against Odom.

Defendant did not testify as a witness in his own behalf but offered the testimony of others tending to show that several people had seen Glenn Gibson alive after 30 March 1978; that the State had agreed to dismiss the charge of accessory after the fact against David Odom in exchange for his testimony against defendant; that the army hatchet identified as the murder weapon is a standard item often carried by boy scouts and that such hatchet was especially common in the Cumberland County area.

The jury convicted defendant of murder in the first degree and the presiding judge, pursuant to a consent order entered by him at the commencement of the trial, sentenced defendant to life imprisonment without conducting a sentencing proceeding to determine whether the punishment should be death or life imprisonment as required by G. S. 15A-2000. Defendant appealed and assigns errors discussed in the opinion.

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, and Thomas J. Ziko, Associate Attorney, for the State.*

*H. Gerald Beaver, attorney for defendant appellant.*

HUSKINS, Justice.

Denial of defendant's motion to suppress all evidence obtained in a search conducted pursuant to a search warrant issued on 23 August 1978 constitutes defendant's first assignment of error.

The record reveals that Ken Snead, an SBI investigator, interrogated David Odom for fifteen hours during which Odom told the investigator that he and defendant James Thomas Jones were involved in the murder of Glenn Gibson. Odom furnished the details concerning the crime, including information that a two-

inch piece of water pipe was the murder weapon and that an army hatchet with a cover over its metal part and welder's gloves had been used by defendant during the murder. Relying on information obtained from Odom, Mr. Snead searched a section of the river bank along the Cape Fear River, an area behind the victim's home, and a site in Scotland County. These searches produced various items of evidence consistent with Odom's statements to Mr. Snead. With the reliability of Odom's information thus established, Mr. Snead procured a warrant to search defendant's truck and to search his father's house, barn and garage for various items, including "an army-type hatchet with a green cloth cover" and " 'Case XX' welder's gloves soaked in oil." Armed with the search warrant, Mr. Snead and Officer Connerly proceeded to the home of Mr. and Mrs. M. L. Jones, parents of defendant, located at Route 1, Box 301, Shannon, N. C., to begin the search. During the search of the M. L. Jones garage, they discovered and seized an army O.D.-type hatchet (State's Exhibit 17), with the word "U.S." stamped on it, one pair of men's leather-type welder's gloves (State's Exhibit 39), and a single leather-type welder's glove (State's Exhibit 40). These items were later offered in evidence over objection. Defendant contends his motion to suppress them should have been allowed because (1) the affidavit on which the search warrant was issued failed to allege facts sufficient to establish probable cause; and (2) an unreasonable length of time expired between the alleged homicide on 30 March 1978 and the date of the search and seizure on 23 August 1978. We hold defendant's contentions are unsound and that his first assignment of error has no merit.

[1,2] Within the meaning of the Fourth Amendment and G.S. 15A-243 to 245, "probable cause means a reasonable ground to believe that the proposed search will reveal the presence, upon the premises to be searched, of the objects sought and that those objects will aid in the apprehension or conviction of the offender. Thus, the affidavit upon which a search warrant is issued is sufficient if it 'supplies reasonable cause to believe that the proposed search for evidence of the commission of the designated criminal offense will reveal the presence upon the described premises of the objects sought and that they will aid in the apprehension or conviction of the offender.' " *State v. Riddick*, 291 N.C. 399, 230 S.E. 2d 506 (1976) (citations omitted). *Accord, State v. Campbell*,

282 N.C. 125, 191 S.E. 2d 752 (1972). "The affidavit may be based on hearsay information if the magistrate is informed of underlying circumstances upon which the informant bases his conclusion as to the whereabouts of the articles and the underlying circumstances upon which the officer concluded that the informant was credible." *State v. Spillars*, 280 N.C. 341, 185 S.E. 2d 881 (1972). Whether probable cause exists for the issuance of a search warrant depends upon a practical assessment of the relevant circumstances. *State v. Phifer*, 297 N.C. 216, 254 S.E. 2d 586 (1979); *State v. Louchheim*, 296 N.C. 314, 250 S.E. 2d 630, cert. denied, 40 CCH S.Ct. Bull. p. 15 (1979). Each case must be decided on its own facts and "reviewing courts are to pay deference to judicial determinations of probable cause, and 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *State v. Louchheim, supra,* (citations omitted). With these principles in mind, we look at the search warrant and the affidavit upon which it was obtained.

[3] In applying for the search warrant SBI Agent Snead swore, in his affidavit to establish probable cause for issuance, that the body of Glenn Gibson had been found in a ditch near milepost 187 beside I-95 in Dillon County, South Carolina; that defendant James Thomas Jones and David Carl Odom had been arrested for the murder of Mr. Gibson; that David Carl Odom had given oral and written statements detailing participation in the murder by him and defendant; that Odom had accompanied officers to the crime scene on the banks of the Cape Fear River where the murder weapon had been recovered with other items; that Odom had shown officers the area behind the victim's residence where the body was kept for a week before it was taken to South Carolina; that Odom had stated that the hatchet used in the killing along with the pipe, already recovered, was the property of defendant and that defendant kept the hatchet and welder's gloves either in the garage workshop or in the house of his parents located at Route 1, Box 301, Shannon, North Carolina, telephone 875-2510. It further appears that Odom and defendant had jointly participated in the murder of Glenn Gibson and had moved the body twice. Odom knew where defendant's parents lived and knew there was a workshop behind their house which was used by defendant.

All this information was before the magistrate. A practical assessment of it would lead a reasonably prudent magistrate to conclude that the information was credible and that the proposed search would reveal, upon the premises to be searched, the presence of the objects sought and that those objects would aid in the apprehension or conviction of the offender. This constitutes probable cause sufficient to justify the issuance of a warrant.

[4] Defendant contends that the information contained in the affidavit furnished the magistrate suffers from staleness. He argues that five months elapsed between the time Odom last saw defendant's hatchet and welder's gloves and the date Odom told officers of the whereabouts of the hatchet. The passage of such time, it is urged, dissipates probable cause to believe that the materials sought were still located at the place to be searched.

Common sense is the ultimate criterion in determining the degree of evaporation of probable cause. *United States v. Brinklow*, 560 F. 2d 1003 (10th Cir. 1977), *cert. denied*, 434 U.S. 1047 (197 ); *State v. Louchheim, supra*. "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock . . . ." *Andresen v. State*, 24 Md. App. 128, 331 A. 2d 78, *cert. denied*, 274 Md. 725 (1975), *aff'd*, 427 U.S. 463 (1976). "The significance of the length of time between the point probable cause arose and when the warrant issued depends largely upon the property's nature, and should be contemplated in view of the practical consideration of everyday life." *United States v. Brinklow*, supra (citations omitted).

The items sought by the search warrant—a hatchet and welder's gloves—were not particularly incriminating in themselves and were of enduring utility to defendant. Moreover, the affidavit indicates that defendant normally kept such items either in his parents' home, or in a garage workshop behind his parents' home. A practical assessment of this information would lead a reasonably prudent magistrate to conclude that the hatchet and welder's gloves were "probably" located in the home or on the premises of defendant's parents. *See generally, United States v. Brinklow, supra; State v. Louchheim, supra; State v. Carbone*, 172 Conn. 242, 374 A. 2d 215 (1977); *People v. Wing*, 92 Misc. 2d 846, 400 N.Y.S. 2d 437 (Cty. Ct. 1977). We hold that the search warrant

was properly issued and the hatchet and gloves properly admitted into evidence.

[5]   We note that the items in question were seized from the premises owned by defendant's parents. A party seeking shelter under the Fourth Amendment has the burden of establishing that his *personal rights* were violated by the search and seizure. *State v. Taylor,* 298 N.C. 405, 259 S.E. 2d 502 (1979); *State v. Craddock,* 272 N.C. 160, 158 S.E. 2d 25 (1967). The burden is on defendant to establish standing. *State v. Taylor, supra.* The United States Supreme Court, in a recent review of the protection offered by the Fourth Amendment, determined that such protection encompasses only those persons who have a reasonable expectation of privacy in the premises searched. *Rakas v. Illinois,* 439 U.S. 128, 58 L.Ed. 2d 387, 99 S.Ct. 421 (1978). *Accord, State v. Alford,* 298 N.C. 465, 259 S.E. 2d 242 (1979). In the instant case, defendant has asserted neither a property nor a possessory interest in his parents' garage. Nor has he made a showing of any other circumstances giving rise to a reasonable expectation of privacy in the premises searched. Therefore, irrespective of the existence of probable cause to issue the warrant and the reasonableness of the search and seizure, defendant has failed to establish his standing to object.

[6]   The State offered evidence over objection tending to show (1) that defendant and the victim Gibson had been jointly involved in certain thefts of tobacco in Robeson County, and (2) that defendant, the victim Gibson and David Odom had been collectively involved in several car thefts. Defendant contends that admission of evidence of other crimes is prejudicial error. This constitutes his second assignment of error.

It is undoubtedly the general rule that evidence of the commission of other crimes is not admissible to prove defendant's guilt of the crime for which he is on trial. *State v. Hight,* 150 N.C. 817, 63 S.E. 1043 (1909). Even so, there are various exceptions to the general rule, as well established as the rule itself. *See State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954), containing eight numbered exceptions and citing many authorities. Pertinent to the case before us is the fifth exception listed in *McClain,* to wit: "Where evidence tends to prove a motive on the part of the accused to commit the crime charged, it is admissible, even though

it discloses the commission of another offense by the accused." (Citations omitted.) Motive is always a relevant fact, and evidence tending to prove it will not be excluded merely because it also shows the accused to have been guilty of an independent crime. *See State v. Williams,* 292 N.C. 391, 233 S.E. 2d 507 (1977) (evidence of defendant's participation in a prior armed robbery and murder competent to show motive for committing the crime charged); *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962) (theft of automobile a month before a murder committed in perpetration of a robbery admissible to show that purpose of the robbery was to obtain money to pay repair bills and regain possession of car); *State v. Adams,* 245 N.C. 344, 95 S.E. 2d 902 (1957) (evidence of illicit liquor activities by defendant competent to show motive for killing supposed informer); 1 Stansbury's North Carolina Evidence (Brandis rev. 1973) §§ 91, 92.

It is apparent from the record in this case that evidence with respect to theft of tobacco and cars was offered and admitted for the purpose of showing defendant's motive for killing Gibson. David Odom testified that defendant "thought Gibson was talking too much" and "was scared that if Gibson went to court he would talk and tell them everything." The trial court properly permitted the State to offer the challenged evidence to show defendant's motive for killing Gibson. There is no merit in this assignment.

The remaining assignments are not discussed in defendant's brief and have been expressly abandoned under Rule 28, Rules of Appellate Procedure.

We note, *ex mero motu,* that the presiding judge in this case, for reasons not readily apparent, and in violation of the provisions of G.S. 15A-2000, *et seq.,* sentenced defendant to life imprisonment without conducting a separate sentencing proceeding on the issue of punishment.

Defendant was convicted of a capital felony. G.S. 15A-2000(a)(1) provides that upon conviction or adjudication of guilt of a defendant of a capital felony, "the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment." Succeeding subsections of G.S. 15A-2000 delineate in detail the separate sentencing proceeding to be conducted and the circumstances, aggravating and mitigating, to be considered by

the jury in determining whether the sentence shall be death or life imprisonment. Even upon pleas of guilty to a capital offense, the presiding judge is required to empanel a jury for the limited purpose of hearing evidence and determining a sentence recommendation. G.S. 15A-2001. The presiding judge is required by G.S. 15A-2002 to follow the recommendation of the jury and impose the sentence recommended. In *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979), Justice Exum, writing for the Court, said: "The question raised is whether a defendant may plead guilty to first degree murder and by prearrangement with the State be sentenced to life imprisonment without the intervention of a jury. The answer is no." Following a discussion of the provisions of G.S. 15A-2000, *et seq.,* Justice Exum continued: "We do not see how the legislature could have expressed in plainer language its intent that the question of sentence in a capital case be determined in the same manner whether a defendant pleads guilty to the capital offense or is found guilty by a jury. Neither does the statute permit the state to recommend to the jury during the sentencing hearing a sentence of life imprisonment when the state has evidence from which a jury could find at least one aggravating circumstance beyond a reasonable doubt." *Accord, State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979).

[7]  In the instant case there was evidence from which the jury could have found at least one or more aggravating circumstances beyond a reasonable doubt. There was evidence, for example, which tended to show the especially heinous, atrocious, and cruel manner in which the victim Gibson was clubbed to death—an aggravating circumstance listed in G.S. 15A-2000(e)(9). Given the existence of such evidence, the presiding judge, district attorney, and defense counsel had no legal authority whatsoever (1) to announce that the State would not seek the death penalty, (2) to agree to make no motions concerning the death penalty, (3) to eliminate voir dire examinations of jurors with respect to the death penalty, (4) to eliminate the separate sentencing proceeding to determine whether the punishment should be death or life imprisonment, or (5) by consent to fix the punishment at life imprisonment should the jury convict defendant of murder in the first degree. These unauthorized "homemade" procedures must not recur. Double jeopardy considerations preclude a retrial of this case. Since the impermissible procedure adopted by the trial

court resulted in error obviously favorable to the defendant, he is in no position to complain.

Prejudicial error not having been shown, the verdict and judgment will be upheld.

No error.