IN THE SUPREME COURT OF NORTH CAROLINA

No. 124PA22

Filed 22 March 2024

STATE OF NORTH CAROLINA

v.

RICHARD HENRY JORDAN, JR.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision
of the Court of Appeals, 282 N.C. App. 651 (2022), reversing an order entered on 22
January 2020 by Judge Daniel Kuehnert in Superior Court, Mecklenburg County,
and remanding the case. Heard in the Supreme Court on 7 November 2023.

*Joshua H. Stein, Attorney General, by Michael T. Henry, Special Deputy
Attorney General, for the State-appellant.*

*Christopher A. Brook for defendant-appellee.*

DIETZ, Justice.

While investigating reports of a stolen car, law enforcement officers observed
a suspect retreat to a nearby home. The officers followed the suspect into the home
and saw evidence of an illegal drug operation.

The issue presented in this case is whether defendant—one of the participants
in that drug operation—has standing to challenge the officers' warrantless entry into
the home. Defendant told the police he did not live there. Defendant's uncle, who was
also present, told the officers that he lived there and consented to a search. The uncle
also told the officers that one of the other men present—the original suspect that led

officers to the home—was temporarily staying there and had some personal belongings in the home. The uncle did not indicate that defendant lived in the home or frequently visited.

After a suppression hearing, the trial court orally denied defendant's motion to suppress, referencing defendant's lack of any reasonable expectation of privacy in the home. The court's oral ruling did not include clearly identified findings of fact, with much of the court's discussion being mere recitation of the evidence. The court instructed the State to prepare a draft order, which the court would then enter to memorialize its ruling.

That never happened, and the case went to trial without the trial court memorializing its oral ruling in a written order with express fact findings. After the jury convicted defendant of a number of drug-related offenses, defendant appealed. The Court of Appeals reversed the trial court's denial of the motion to suppress, reasoning that the trial record would not support any finding that defendant lacked a reasonable expectation of privacy in the home.

As explained below, we reverse the decision of the Court of Appeals. The evidence presented at the suppression hearing *could* support findings that defendant lacked standing to challenge the search. But the trial court never made those findings, despite being compelled to do so because the trial record contains materially conflicting evidence. *See State v. Bartlett*, 368 N.C. 309, 312 (2015).

We therefore reverse the decision of the Court of Appeals and remand with

instructions to further remand this matter to the trial court to make findings of fact based on the trial record. The trial court, based on those new findings, may again deny the motion to suppress, leaving defendant's convictions intact, or it may grant the motion to suppress in whole or in part and order a new trial. *See State v. Hammonds*, 370 N.C. 158, 160–62 (2017).

## Facts and Procedural History

In 2017, law enforcement officers arrived in a residential neighborhood to investigate reports of a stolen car. The officers located the stolen car in a parking lot. While observing the car, officers saw Marcel Thompson leave a nearby house and approach the car as if he planned to enter it. After Thompson saw the officers, he turned and hurried back towards the house.

Thompson knocked on the door of the house and said "it's the police" loudly enough for the officers to hear as they followed him. Defendant opened the door to let Thompson into the home. Thompson left the door open as he entered. One officer put his foot through the threshold of the door and told the occupants that he wanted to speak with them. After Thompson declined to step outside, the officer fully entered the home, while another officer moved into the doorway.

The second officer observed defendant close a safe that was sitting on a table in the center of the room. The officer saw defendant lock the safe and put a key in his pocket. That officer also saw baggies, razor blades, and white powder on the same table.

There were two other individuals in the house with Thompson and defendant. Officers asked the occupants who lived in the home. One of the occupants, James Deitz,[1] told the officers that he resided in the home. Officers later learned that Deitz is defendant's uncle.

The officers asked Deitz for permission to search the home, and Deitz consented. When the officers asked to search the safe, defendant claimed the safe was not his. Defendant then objected to the officers searching the safe and refused to provide them with the key. When the officers asked defendant if he lived in the home, he stated, "I don't have anything to do with anything that's in here. I don't live here. This has nothing to do with me."

Defendant further explained, "I came to visit my uncle. I don't live in here period, there is nothing here in my name." When the officers again asked if defendant lived at the home, he responded, "No, I don't live here." The officers then pointed out that because defendant had the key to the safe, he must at least own what is in the safe, but defendant again responded, "No."

The officers discussed with Deitz who resided in the house. Deitz told the officers that Thompson had been staying in the house for a few days. Thompson confirmed that he had various belongings in the home. Neither Deitz nor Thompson indicated that defendant also stayed at the home, which was relatively small and had

---

[1] The State uses the name "James Deitz." Defendant uses the name "James Deese." As explained below, because the trial court did not enter a written order, the record does not definitively resolve the correct spelling of this witness's surname.

only one bedroom, and no one identified any of defendant's belongings inside the home.

The officers later obtained a warrant to search the safe and the home. Inside the safe, the officers found a firearm, cocaine in different baggies, and money. Throughout the home, the officers found baggies, syringes, razor blades, and scales.

The State charged defendant with trafficking cocaine, possession of a firearm by a felon, possession of drug paraphernalia, and attaining habitual felon status.

Before trial, defendant filed a motion to suppress the evidence, claiming that the officers unlawfully entered Deitz's home. At the hearing, both parties briefly addressed the issue of defendant's expectation of privacy in the home, but it was not a focus of either side's arguments.

At the end of the hearing, the trial court orally denied defendant's motion to suppress. As is common in these scenarios, the trial court's oral ruling did not include clearly defined findings of fact and conclusions of law. Instead, the trial court indicated that it would enter a written order memorializing the oral ruling. The court instructed the State to prepare a draft order. The parties acknowledge on appeal that the trial court never entered a written order as anticipated at the hearing.

A jury later found defendant guilty of trafficking cocaine, possession of a firearm by a felon, and possession of drug paraphernalia. Defendant then pleaded guilty to attaining habitual felon status. After entry of judgment, defendant appealed from the judgments, arguing that the trial court erred by denying his motion to

suppress.

On appeal, the Court of Appeals reversed the trial court's order and remanded the case. *See State v. Jordan*, 282 N.C. App. 651 (2022). We allowed the State's petition for discretionary review.

**Analysis**

By statute, when a trial court rules on a motion to suppress, the court must "make findings of fact and conclusions of law which shall be included in the record." N.C.G.S. § 15A-974(b) (2023); *see also id.* § 15A-977. The need to make findings of fact is crucial for appellate review because appellate courts "cannot find facts." *Pharr v. Atlanta & Charlotte Air Line Ry. Co.*, 132 N.C. 418, 423 (1903). Instead, appellate courts examine only "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Biber*, 365 N.C. 162, 167–68 (2011). When the trial court does not make findings of fact, this can frustrate our ability to engage in appellate review because we have no underlying facts to which we can apply the law. *Bartlett*, 368 N.C. at 312.

Although trial courts can make the necessary findings of fact in an oral ruling, we have long held that entering a written order with findings of fact "is the better practice." *Id.* One reason for doing so is that it can be difficult in an oral ruling to distinguish between "a mere recitation of the evidence" and "true findings." *Harrison v. Gemma Power Sys., LLC*, 369 N.C. 572, 583 (2017).

For example, when announcing an oral ruling, trial courts often will describe

the testimony and evidence received at the hearing. The court might say, "The officer testified that the door was open." Is this a finding that the officer's testimony is credible and, thus, a finding that the door was indeed open? On a cold appellate record, it can be hard to tell.

As a result, when the trial court fails to make express findings of fact, either orally or in a written order, we typically remand the matter for the trial court to do so as required by the applicable statutes. *See State v. Salinas*, 366 N.C. 119, 122–26 (2012). But we have also recognized an exception to this general rule: "Although the statute's directive is in the imperative form, only a material conflict in the evidence— one that potentially affects the outcome of the suppression motion—must be resolved by explicit factual findings that show the basis for the trial court's ruling." *Bartlett*, 368 N.C. at 312. When there is no material conflict in the evidence, "the trial court's findings can be inferred from its decision." *Id.*

Here, we cannot infer the necessary findings under *Bartlett* because there is a material conflict in the evidence that the trial court must resolve. The central issue in this motion to suppress is whether defendant has standing to challenge the officers' search of the home. A defendant may move to suppress evidence only when the defendant's own rights, "not those of some third party," have been violated. *State v. Taylor*, 298 N.C. 405, 415 (1979). Thus, before a defendant may challenge the legality of a search, he must demonstrate that the room in the home "where the search occurred was an area in which he had a reasonable expectation of privacy." *Id.* at 416.

The burden is on the defendant to prove that he had the requisite expectation of privacy. *State v. Jones*, 299 N.C. 298, 306 (1980).

There is no fixed test for assessing a defendant's expectation of privacy, but the expectation must be "one that society deems to be reasonable." *State v. Wiley*, 355 N.C. 592, 602 (2002). Every case is fact specific. For example, overnight guests typically have a reasonable expectation of privacy in the area where they are staying, even if they are merely a temporary visitor. *Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990). Similarly, a family member who is a "frequent visitor" to the home of a relative may develop a reasonable expectation of privacy in the relative's home. *E.g.*, *Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996). By contrast, one who visits another's home "for a business transaction" and remains there only to conduct that transaction likely does not have a reasonable expectation of privacy in the home. *Minnesota v. Carter*, 525 U.S. 83, 90 (1998).

Here, there are fact questions that must be resolved to apply these legal principles to this case. For example, defendant told the officers that he did not live in the home and that "there is nothing here in my name." Deitz, who identified himself as the resident of the home, consented to the search. Deitz also explained to the officers that Thompson—the man police had followed from the stolen car to the home—was staying in the house for a few days. Thompson confirmed that he had various belongings in the home.

Importantly, Deitz did not tell the officers that defendant also was staying at

the home or that defendant had any belongings there. Nor is there any direct evidence of whether defendant was a frequent visitor to Deitz's home or had the sort of relationship with Deitz that could give defendant a reasonable expectation of privacy in the home.

The trial court reasonably could infer from the statements of Deitz and Thompson that only those two individuals had a reasonable expectation of privacy in the home and that the others present were there solely to participate in the illegal drug operation. *See Carter*, 525 U.S. at 90. This finding would support the trial court's conclusion that defendant, unlike Deitz and Thompson, did not have a reasonable expectation of privacy in the home. But, as noted above, the trial court did not make that fact finding because it did not make any fact findings.

The dissent insists that there is no need for further fact-finding because there are "uncontroverted" facts that show an expectation of privacy. In doing so, the dissent merely highlights why further fact-finding is needed.

For example, the dissent asserts that defendant had "authority to let persons into the home regardless of whether Mr. Deitz was present." There is no direct evidence of this. Deitz did not say this was so. Nor did defendant. This is an *inference* that defendant draws in his appellate briefing from the fact that he opened the door and let Thompson in.

But a fact-finder would not be compelled to draw this inference. Indeed, a fact-finder might reasonably infer the opposite—that defendant ordinarily would not have

permission to let others into the home, but did so here because Thompson was pounding on the door shouting, "it's the police," and Deitz was not in the room at the time.

The same is true of the other purported facts identified by the dissent; they are not facts, they are inferences. And for each of them, a fact-finder also could draw a competing inference in the opposite direction. This Court cannot choose between these competing inferences. When "different inferences may be drawn from the evidence," only the trial court, as fact-finder, can determine "which inferences shall be drawn and which shall be rejected." *Knutton v. Cofield*, 273 N.C. 355, 359 (1968).

Accordingly, we reject the Court of Appeals' determination that the trial record "does not support a finding that Defendant lacked a reasonable expectation of privacy in the residence searched." *Jordan*, 282 N.C. App. at 660. We hold that the record *could* support the necessary findings, but there are material fact questions that must be resolved by the fact-finder before any legal conclusion can be reached.

In sum, because the trial court did not enter a written order as intended at the conclusion of the suppression hearing, the trial court did not make adequate findings of fact "that resolved the material conflict in the evidence." *See Bartlett*, 368 N.C. at 312. "Without such a finding, there can be no meaningful appellate review of the trial judge's decision." *Id.*

When the trial court fails to resolve fact issues necessary to review the trial court's legal conclusions, "an appellate court may remand the cause for appropriate

proceedings without ordering a new trial." *State v. Lang*, 309 N.C. 512, 523–24 (1983). We therefore reverse the decision of the Court of Appeals and remand with instructions to further remand this matter to the trial court to make the necessary findings of fact based on the trial record. The trial court, based on those new findings, may again deny the motion to suppress, leaving defendant's convictions intact, or it may grant the motion to suppress in whole or in part and order a new trial. *See Hammonds*, 370 N.C. at 160–62.

## Conclusion

We reverse the decision of the Court of Appeals and remand for further proceedings.

REVERSED AND REMANDED.

Justice RIGGS dissenting.

The majority remands this matter to the trial court for further findings of fact that it believes are necessary to conclude that Mr. Jordan possessed a reasonable expectation of privacy in the premises illegally searched by law enforcement. Because I believe there is already adequate uncontradicted evidence in the record to establish such a conclusion, I respectfully dissent.

I begin with the uncontroverted facts established from the evidence introduced at the suppression hearing. Mr. Jordan's uncle, Mr. Deitz, resided in the premises searched.[1] Mr. Jordan himself had permission to be in the residence late at night, even when Mr. Deitz was not at home. Mr. Jordan also had authority to let persons into the home, regardless of whether Mr. Deitz was present.[2] Mr. Jordan was likewise familiar with the home and the fact that the house had been divided to allow businesses, like a salon, to operate out of the space.[3] And Mr. Jordan, at a minimum, had access to and control over a safe in the home—and a safe's very purposes are to sharply limit indiscriminate access, deter discovery, and ensure the privacy of its

---

[1] There is no question from the evidence that the premises searched belonged to Mr. Deitz, or that Mr. Deitz was Mr. Jordan's uncle.

[2] The majority asserts this is exclusively based on an inference from the fact that Mr. Jordan opened the door for Mr. Thompson. It is not; instead, it is supported by a witness's statement—captured on an officers' body camera video and introduced into evidence at the suppression hearing—that Mr. Jordan and Mr. Thompson were the only persons present at the home when she arrived.

[3] Mr. Jordan evinced such knowledge in direct statements on the body camera footage introduced into evidence.

contents.[4]

The above undisputed facts establish Mr. Jordan's reasonable expectation of privacy in the premises searched. Familial relations certainly weigh in favor of that conclusion. *See, e.g., United States v. Washington*, 573 F.3d 279, 289 (6th Cir. 2009) (holding a nephew had a reasonable expectation of privacy in his uncle's apartment); *United States v. Heath*, 259 F.3d 522, 533 (6th Cir. 2001) (cousins); *Figueroa v. Mazza*, 825 F.3d 89, 110 (2d Cir. 2016) (mother and son); *cf. United States v. Gray*, 491 F.3d 138, 153 (4th Cir. 2007) (recognizing Fourth Amendment standing of "social visitors with near-familial relationships"). That Mr. Jordan was entrusted to be at the home without Mr. Deitz likewise discloses a substantial measure of control over and acceptance into the household. *Cf. Minnesota v. Olson*, 495 U.S. 91, 99 (1990) (noting that overnight guests are likely to have a reasonable expectation of privacy in another's residence because "[i]t is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises"). So, too, does the fact that Mr. Jordan had the ability to control admission into the home. *See Rakas v. Illinois*, 439 U.S. 128, 149 (1978) (holding a visitor had a reasonable expectation of privacy in a friend's apartment because he "had complete dominion and control over the apartment and could exclude others from it"). Further, his ownership and/or control over a safe in

---

[4] That Mr. Jordan had access to and control over the safe is not disputed by the evidence and is accepted by the majority.

the home—together with repeated assertions that police lacked permission to access it—necessarily bestowed him with authority to "preserve as private" materials in the home. *Katz v. United States*, 389 U.S. 347, 351 (1967). All of these facts establish that Mr. Jordan, as a trusted family member of Mr. Deitz with substantial unsupervised control over access to the home and the locked safe within, had "a legitimate expectation of privacy there." *See Olson*, 495 U.S. at 96.

I do not believe the conflicts in the evidence identified by the majority undercut that conclusion. Whether Mr. Deitz and Mr. Thompson were the only overnight residents of the home with common law property interests in the possessions therein is not dispositive. *See Gray*, 491 F.3d at 153 ("[W]e have recognized that persons other than overnight guests can have a legitimate expectation of privacy in the home of another . . . in the context of social visitors with near-familial relationships."); *Rakas*, 439 U.S. at 144 n.12 ("Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest."). Nor does that question diminish the fact that Mr. Jordan is a family member with the right to control and access both the home—including outside Mr. Deitz's presence—and a safe found inside it. The fact that illegal activity was underway at the time police arrived does not change the calculus; a college student with free and unsupervised access to a relative's home and locked liquor cabinet is still a familial relation with substantial acceptance into the relative's household—even if the student uses the space for a

homeowner-approved and invite-only illegal poker game involving underage drinking.[5] Privacy interests of close friends and family with acceptance into and control over the home are not erased because the location is being used for illegal activity at the time of the search. *See, e.g., United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000) (holding a defendant had a reasonable expectation of privacy in a friend's home despite his use of the house "to complete an illegal sale of cocaine"); *United States v. Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) (holding a social guest who was permitted to remain in the home to conduct a drug sale after the resident left had a reasonable expectation of privacy in the home).

In sum, I do not agree with the majority that the identified conflicts in the evidence require resolution to conclude that Mr. Jordan had Fourth Amendment standing to challenge the search of his uncle's residence. His familial relationship, familiarity with the home, unsupervised control of admittance into the house during late-night hours, and his authority over access to the safe inside combine to establish that has was so accepted into the residence as to have a reasonable expectation of

---

[5] The majority relies on *Minnesota v. Carter*, 525 U.S. 83, 90 (1998), for the proposition that Mr. Jordan lacked a reasonable expectation of privacy if he was present "solely to participate in the illegal drug operation." This is an overreading of *Carter*, which held that non-overnight guests lacked a reasonable expectation of privacy in the searched premises because they "were essentially present for a business transaction[,] . . . [t]here [was] *no suggestion that they had a previous relationship with* [the resident,] . . . [n]or was there anything similar to the overnight guest relationship . . . *to suggest a degree of acceptance into the household.*" *Id.* (emphases added); *see also United States v. Gamez-Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) ("An individual whose presence on another's premises is *purely* commercial in nature . . . has no legitimate expectation of privacy in that location." (emphasis added) (citing *Carter*, 525 U.S. at 90)).

privacy independent of his purposes for being there, his status as a non-overnight guest, or his lack of legal ownership.  I would therefore affirm the Court of Appeals' decision and respectfully dissent.

Justice EARLS joins in this dissenting opinion.