STATE OF NORTH CAROLINA v. JEROME H. LOUCHHEIM III

No. 50

(Filed 4 January 1979)

1. **Searches and Seizures § 23— false information in affidavit—other information sufficient for probable cause**

   A search warrant was not invalid because the affidavit on which the warrant was based contained false information where there was probable cause to support the warrant on the face of the affidavit when the false information is disregarded.

2. **Searches and Seizures § 24— probable cause—business records—elapse of 14 months since informants saw records**

   There was a "substantial basis" for a magistrate to conclude that business records relating to a State advertising contract were "probably" located at defendant's business offices on the date a search warrant was issued where an officer's affidavit stated that two persons had seen two different sets of invoices relating to the costs incurred under the contract some 14 months earlier; the affidavit further alleged that the invoices "were never removed from [defendant's] offices . . . but were kept in those offices in compliance with the State advertising contract"; the place to be searched was an ongoing business; and the warrant authorized a search for other business records constituting evidence of an alleged crime of obtaining property from the State by false pretense in addition to the two sets of invoices observed 14 months earlier.

3. **Criminal Law § 15— motion to dismiss for improper venue—burden of proof**

   When a defendant makes a motion to dismiss for improper venue, the burden is on the State to prove by a preponderance of the evidence that the offense occurred in the county named in the indictment.

4. **Criminal Law § 15— proper venue—sufficiency of evidence**

   The State carried its burden of proving that Wake County was the proper venue in a prosecution for conspiracy to commit false pretense and obtaining money by false pretense by overbilling the State for advertising work where it presented evidence that defendant's place of business was located in Wake County, that defendant submitted allegedly false bills to the State from defendant's business in Wake County, and that the State received those bills in Wake County.

5. **Criminal Law § 15— motion to dismiss for improper venue—proof required**

   In a hearing on a motion to dismiss for improper venue, the State does not have to prove that a crime actually occurred but only that *if* a crime took place, it occurred in the county named in the indictment.

6. **Criminal Law § 15— motion to dismiss for improper venue—affidavit—harmless error**

The admission of an affidavit in a hearing on a motion to dismiss for improper venue, if error, was not prejudicial to defendant where the oral testimony properly admitted at the hearing was sufficient to show that the alleged crimes were committed in the county named in the indictment.

7. **Criminal Law § 56— expert in accounting—comparison of cost figures—determination of deductions**

In this prosecution for conspiracy to commit false pretense and false pretense in overbilling the State for advertising work, the testimony of an expert in accounting and auditing comparing the total amount defendant billed the State for work done by another advertising agency with the amount defendant paid such agency for production work pursuant to the State contract was not incompetent because the witness made certain deductions for work that was unrelated to the State contract and for postage when he did not actually know whether certain charges were unrelated to the State contract and whether postage was properly included in production costs, since such determination logically stemmed from the witness's expertise and experience in auditing and accounting and from his own personal examination of the documents in question.

8. **Criminal Law § 56— expert testimony by accountant—basis—documents not in evidence**

A sufficient basis was shown for testimony by an expert in accounting and auditing as to the amount defendant overbilled the State for advertising work where· the witness admitted that he had used several documents not in evidence to reach his conclusion as to the total overbillings but testified as to the existence of such documents, where he got them, what they contained, and how they were used in preparing a chart showing the overbillings.

9. **Conspiracy § 6; False Pretense § 3.1— overbilling State for advertising work—false representations**

In this prosecution for conspiracy to commit false pretense and false pretense in overbilling the State for advertising work, there was sufficient evidence from which the jury could infer that false representations were made by defendant where the State's evidence tended to show that defendant's advertising contract with the State provided that defendant's agency was to be paid for production work purchased from outside sources "for actual amounts paid by the agency or in accordance with the prevailing rate for this type of work, whichever is lower," and that defendant paid another agency less for work performed by such agency than amounts billed by defendant to the State for such work.

10. **Corporations § 8; Criminal Law § 9; False Pretense § 1— corporation as alter ego of individual—criminal liability of individual for corporate acts**

Defendant could properly be convicted of obtaining property from the State by false pretense even though the false representations were made by a corporation where the indictments charged and the evidence tended to show that the corporation was the *alter ego* of defendant, and the evidence also

tended to show that defendant was the person who ordered that inflated bills for advertising work be submitted to the State.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

THIS Court granted defendant's petition for discretionary review of the decision of the Court of Appeals, 36 N.C. App. 271, 244 S.E. 2d 195 (1978) (*Clark, J.*, concurred in by *Morris* and *Arnold, JJ.*), which found no error in his conviction entered in the 10 June 1977 Session of WAKE County Superior Court, *Braswell, J.* presiding.

On 25 May 1976, a search warrant was issued by a magistrate on the basis of the affidavit of Curtis L. Ellis, an S.B.I. agent. The affidavit submitted facts alleging probable cause to believe the defendant had obtained money by false pretense through submitting inflated bills and invoices to the State of North Carolina pursuant to an advertising contract. The affidavit also alleged there was probable cause to believe that the business offices of Louchheim, Eng & People, Inc. (formerly Capital Communications, Inc.) contained various documents constituting evidence of the crime. A search was conducted that same day, and various business records were seized.

On 28 June 1976 defendant was charged, in nine separate indictments, proper in form, with conspiracy to commit felonious false pretense and eight charges of feloniously obtaining property by false pretense.

The defendant then moved to quash the search warrant and suppress the use of all materials seized pursuant to it. On 15 July 1976 a pretrial hearing on the motion was held, and the judge denied it. The defendant made a motion to dismiss the indictments on the ground that venue was improper, which also was denied after a pretrial hearing.

At trial the evidence for the State tended to show the following:

On 1 June 1973 Capital Communications, Inc. (hereinafter referred to as CCI), a corporation of which defendant was president and principal stockholder, was let a State advertising contract for the period 1 July 1973 to 30 June 1974. At the time the

contract was let to CCI, Julian Eng was represented as the senior vice president of the company, and he was listed as treasurer of CCI in its franchise tax return filed 12 December 1973. Annual advertising contracts were subsequently let to CCI on 1 July 1974 and 1 July 1975.

Under all three contracts, CCI was to be compensated at the rate of "15% of amount billed, or such fee as may be agreed upon in advance in writing, plus actual expenses incurred." For production work that may be purchased from outside sources, "the advertising agency shall be compensated for actual amounts paid by the agency or in accordance with the prevailing rates for this type of work, whichever is lower." CCI submitted bills to the State under the advertising contract, and State employees testified that the bills were approved and paid. The contracts also stipulated that all invoices were subject to inspection and audit by the State.

In December of 1974 a state auditor, Donnie Wheeler, examined the State CCI account and determined that documentation of the invoices and bills received from that company was inadequate. An audit was conducted, and numerous instances of CCI either overcharging or undercharging the State were discovered. The auditors concluded that the advertising company owed the State approximately $14,000. This figure was later reduced to $10,907 and was paid by CCI.

A second audit began in February of 1976, and all of CCI's accounts were examined, not just the account relating to the State advertising contract. Ad Com International (hereinafter referred to an Ad Com) was a company based in Florida which did some production work for CCI in connection with the State contract and other unrelated contracts. The auditors discovered that the dollar amounts in all the invoices to CCI from Ad Com were different from the amounts stated in bills from CCI to the State for work done by Ad Com relating to the State contract. The defendant explained that the differences were due to a monthly service fee and other expenses that were credited back and forth between the two companies. When the auditors asked CCI personnel for various specific Ad Com invoices, it took anywhere from a matter of minutes to a full day to obtain one. In comparing the invoices with the corresponding bills from CCI to the State, both

the descriptive language and the monetary amounts were identical.

The auditors asked the defendant to assist them in obtaining Ad Com's books. The address for CCI's Florida office and that of Ad Com were the same. He stated that he had nothing to do with Ad Com and therefore could give them neither permission nor access to that company's books. He would, however, contact Mr. Julian Eng, the president of Ad Com, to see if he would grant them permission. Later the defendant informed the auditors that the books had been sent but he never received them.

Toni Brennan testified that when she was working for Ad Com in Florida in the summer of 1974, the defendant asked her to type Ad Com invoices dating from June 1973 from bills CCI had sent the State. The defendant told her "he needed a copy for the auditors because the real bills that were sent up on a monthly basis did not match what he had actually billed the State." Ms. Brennan testified that these bills were different from the corresponding Ad Com invoices she had previously typed; the dollar amounts had been raised. This employee then moved to Raleigh and began working for CCI in October of 1974. The defendant brought back blank Ad Com invoices after a trip to Florida, and she continued to type Ad Com invoices in this fashion from CCI bills sent to the State. The original Ad Com invoices were put in a file folder marked "real" and given to the defendant. The second set were placed in a file folder in the front office of CCI. Ms. Brennan also stated that she typed a few Ad Com invoices during the CCI audit when specific ones were requested.

Ms. Brennan testified she had heard the defendant and Mr. Eng talking about the State contract several times. "It was said that anytime you had a government account you have to milk it for all it's worth and that's when you make all the money you can while you've got it." The two men discussed how they were going to "mark up the bill," and she saw Mr. Eng writing figures on Ad Com bills during phone conversations with the defendant.

Toni Brennan's job was terminated by the defendant on 31 May 1975. Thereafter she informed him that newspaper reporters had been to her office to get information about CCI and the State advertising contract. The defendant told her not to tell the reporters anything and that "they can't prove anything."

State's Exhibit Number 28, introduced into evidence at trial, was a file folder seized during the search of CCI. On the index tab was the heading "BILLS — Ad/Com Billing," and there was a black ink mark between the words "Ad/Com" and "Billing." A document examiner for the S.B.I. testified that the word "Special" had been crossed out.

Donnie Wheeler, a state auditor, took the stand and was qualified by the court as an expert in accounting and auditing. State's Exhibit Number 24 had previously been admitted into evidence and identified as a copy of one of the ledger sheets of Ad Com. State's Exhibit Number 41 had been admitted into evidence and was a compilation of invoices allegedly from Ad Com to CCI that Ms. Brennan testified she had typed from CCI bills to the State at defendant's request. The auditor compared corresponding invoice numbers in the two exhibits, and many of the figures were different.

At the close of the State's evidence, the defendant moved for judgment as of nonsuit on all the indictments. The trial court granted the motion as to one substantive count and denied it as to the conspiracy case and the remaining false pretense charges.

The evidence for the defendant tended to show the following:

Three former employees of CCI testified that in all the time they worked with the defendant, they were aware of no inflated billings to the State. They had never been asked to alter bills in any way. Two other witnesses vouched for the defendant's good reputation in the community.

The defendant took the stand in his own behalf. He stated that sometimes he received "working copies" of Ad Com invoices that were changed either in Florida by Mr. Eng or by him in North Carolina due to increased costs. He admitted that CCI's bookkeeping system was inefficient, partly because reimbursement by the State pursuant to the advertising contract was often erratic and overdue.

The defendant denied asking Toni Brennan or anyone else to type Ad Com invoices from bills that had been submitted to the State. He also denied ever having submitted false bills to the State or having stated that he was going to "milk" the State contract. The "Special" Ad Com file referred to Ad Com work that was unrelated to the State contract.

The defendant testified he had known Mr. Eng for twelve years when CCI obtained the State advertising contract. Mr. Eng was probably introduced at the time as the vice president of CCI, but he was never an officer of that company. In 1975 the defendant and Mr. Eng reorganized CCI and Ad Com into Louchheim, Eng & People, Inc. in order to turn "two unprofitable companies in one that would make some money."

At the close of all the evidence, the defendant renewed his motion as of nonsuit, which was denied. The jury returned verdicts of guilty in the conspiracy case and four of the substantive charges and not guilty in the other three false pretense charges. The Court of Appeals found no error in the trial, and this Court granted defendant's petition for discretionary review.

Other facts relevant to the decision will be included in the opinion below.

*Attorney General Rufus L. Edmisten by Associate Attorney R. W. Newsom III and Associate Attorney J. Chris Prather for the State.*

*Akins, Harrell, Mann & Pike by Bernard A. Harrell and Ragsdale, Liggett & Cheshire by Joseph B. Cheshire V and Peter M. Foley for the defendant.*

COPELAND, Justice.

For the reasons stated below, we have determined that the defendant had a trial free from prejudicial error. His conviction is affirmed.

[1] In his first assignment of error, the defendant contends the trial court erred in denying his motion to suppress the evidence seized pursuant to the search warrant. He claims the affidavit on which the warrant was based contained false information that was crucial for the probable cause determination. We do not agree.

In *Franks v. Delaware*, ---- U.S. ----, 57 L.Ed. 2d 667, 98 S.Ct. 2674 (1978), the United States Supreme Court squarely addressed this issue.

> "[W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and in-

tentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. Id. at ---, 57 L.Ed. 2d at 672, 98 S.Ct. at 2676-77.

In this case there was a pretrial hearing on defendant's motion to suppress the evidence seized during the search. The defendant presented witnesses tending to show that some of the information in the affidavit of the S.B.I. agent was false. Thus, the requirement in *Franks* that a defendant have the opportunity to prove falsity has been met. *See also* G.S. 15A-978(a).

The affidavit in question contained an assertion that Judith Justice, a former employee of CCI, "confirmed the existence of two sets of incompatible and different invoices from Ad-Com International to CCI and Louchheim, Eng and People, Inc." At the motion hearing Mrs. Justice testified she had never said there were "incompatible" sets of invoices. Instead, she had told the agents there were two sets of invoices but that she did not know whether they were alike or different. The S.B.I. agent took the stand and essentially corroborated Mrs. Justice's testimony.

The court found that "the affidavit was truthful as defined in Section 15A-978(a) of the General Statutes in that it reported in good faith, although exaggerated, the circumstances relied upon to establish probable cause." We need not now decide whether the "good faith" test for truthfulness set forth in G.S. 15A-978(a) meets the standards in *Franks* or whether the court's determination of good faith in this case is supported by the evidence. Rather, we find that there was probable cause to support the search warrant on the face of the affidavit when this false information is disregarded.

[2]   The defendant attacks the magistrate's finding of probable cause in this case on the ground that there was no reason to believe the materials sought were located at that time in the place to be searched, the defendant's business offices. It is beyond dispute that probable cause must exist at the time the warrant issues. "[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210, 77 L.Ed. 260, 263, 53 S.Ct. 138, 140 (1932). Whether probable cause exists, however, is a determination based on practicalities, not technicalities, *United States v. Ventresca*, 380 U.S. 102, 13 L.Ed. 2d 684, 85 S.Ct. 741 (1965), and each case must be decided on its own facts. *Sgro v. United States, supra.*

The affidavit in question stated in part:

> "The confidential source of information disclosed that CCI maintained two different sets of invoices detailing the production costs purported to be incurred as a result of the State advertising contract. . . . The informant further related that records concerning the actual and true production costs incurred by Ad-Com International, Inc., were in the possession of Jerome M. Louchheim at the Raleigh offices of Louchheim, Eng and People, Inc. (Formerly CCI). . . . The informant further related based on personal knowledge and observation of the said records and invoices, that said records and invoices were never removed from the offices of Louchheim, Eng and People, Inc. and Jerome H. Louchheim, but were kept in those offices in compliance with the State advertising contract previously entered into with the State of North Carolina. The informant's last personal knowledge of and observation of the said records and invoices was during the month of March of 1975, at which time the said records and invoices were located under lock in the Raleigh offices of Louchheim, Eng and People, Inc. and Jerome H. Louchheim."

Disregarding the allegedly false information, the affidavit also stated that Judith Justice confirms the existence of two sets of Ad Com invoices based on her own observation during her employment at CCI.

We find that the above information was sufficient to establish probable cause for the magistrate to issue the search warrant. Two people had seen different sets of invoices at defendant's offices. Although it was fourteen months since either one had personally observed the invoices, that fact is not conclusive.

"The ultimate criterion in determining the degree of evaporation of probable cause, however, is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc." *Andresen v. Maryland*, 24 Md. App. 128, 172, 331 A. 2d 78, 106 (1975), *cert. denied*, 274 Md. 725 (1975), *aff'd*, 427 U.S. 463, 49 L.Ed. 2d 627, 96 S.Ct. 2737 (1976). *See also United States v. Steeves*, 525 F. 2d 33 (8th Cir. 1975).

In this case, the alleged crime is a complex one taking place over a number of years. The place to be searched is an ongoing business. The affidavit further alleged that the invoices "were never removed from [defendant's] offices . . . but were kept in those offices in compliance with the State advertising contract."

Most important, the items to be seized included "corporate minutes, bank statements and checks, sales invoices and journals, ledgers, correspondence, contracts, . . . and other books and documents kept in the course of business by Louchheim, Eng and People and Capital Communications, Incorporated, of N.C. during all periods which said corporations were under contract to perform any advertising services [for] the State of North Carolina." Thus, the supposedly incompatible invoices that had been seen fourteen months earlier were not the only items to be seized during the search. All these materials could constitute evidence of defendant's alleged crime of obtaining property from the State by false pretense pursuant to the advertising contract.

We think there was a "substantial basis" for the magistrate to conclude that these business records were "probably" located at defendant's business offices on 25 May 1976 when the search

warrant issued. "No more is required." *Rugendorf v. United States,* 376 U.S. 528, 533, 11 L.Ed. 2d 887, 891, 84 S.Ct. 825, 828 (1964). *See also Andresen v. Maryland,* 427 U.S. 463, 49 L.Ed. 2d 627, 96 S.Ct. 2737 (1976). Moreover, reviewing courts are to pay deference to judicial determinations of probable cause, *Aguilar v. Texas,* 378 U.S. 108, 12 L.Ed. 2d 723, 84 S.Ct. 1509 (1964), and "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca, supra* at 109, 13 L.Ed. 2d at 689, 85 S.Ct. at 746. This assignment of error is overruled.

The defendant claims the court improperly denied his motion to dismiss the indictments on the ground that venue was improper.

[3] It is clear that when a defendant makes a motion to dismiss for improper venue in North Carolina, the burden is on the State to prove by a preponderance of the evidence that the offense occurred in the county named in the indictment. *State v. Batdorf,* 293 N.C. 486, 238 S.E. 2d 497 (1977). In this case the indictment specified that venue lay in Wake County.

[4] At the pretrial hearing on defendant's motion, the State introduced testimony that the defendant came to North Carolina when he received the State advertising contract. His place of business, CCI, was located in Raleigh, North Carolina, and vouchers were issued by the State to his Raleigh office pursuant to the contract. In addition, bills or invoices were submitted by the defendant on behalf of CCI to the North Carolina Department of Natural and Economic Resources, which we note is also located in Raleigh. The defendant offered no evidence. Thus, the State proved by a preponderance of the evidence that if the substantive charges of obtaining property by false pretense were committed, they occurred in Wake County.

"It is generally held that the venue in an indictment for conspiracy may be laid in the county where the agreement was entered into, or in any county in which an overt act was done by any of the conspirators in furtherance of their common design." *State v. Davis,* 203 N.C. 13, 25, 164 S.E. 737, 744 (1932), *cert. denied,* 287 U.S. 649, 77 L.Ed. 561, 53 S.Ct. 95 (1932). Again, the evidence recounted above is sufficient to prove that overt acts pursuant to the conspiracy were performed in Wake County; to

wit: submission of allegedly false bills to the State from defendant's Raleigh business and receipt of the State vouchers by that office.

[5] The defendant argues that at the motion hearing the State had the burden of proving a crime actually occurred in addition to proving where it allegedly took place. This contention is without merit. The issue of whether there is reason to believe a crime was committed is properly raised at the probable cause hearing and at trial, not at a pretrial hearing on a motion to dismiss for improper venue. At the motion hearing, the State has to prove merely that *if* a crime took place, it occurred in the county indicated in the indictment.

[6] The State introduced the affidavit of Charles Randell Lassiter III over defendant's objection at the pretrial hearing. The defendant claims that this action constituted error in that the affidavit was inadmissible hearsay and violated defendant's Sixth Amendment right to confront the witnesses against him.

We need not decide whether the admission of that document was improper. As shown above, the oral testimony properly admitted at the hearing was sufficient to show that the alleged crimes were committed in Wake County. Therefore, the admission of the affidavit, if error, was nonprejudicial beyond a reasonable doubt. This assignment of error is overruled.

[7] Defendant next assigns as error the fact that Donnie Wheeler testified before the jury regarding CCI's total overbillings to the State and used State's Exhibit Number 45 to illustrate his testimony. The defendant argues that this evidence was incompetent and inadmissible because it was based on the auditor's unfounded assumptions and on evidence not admitted at trial.

Before Mr. Wheeler testified, a *voir dire* was conducted, and he was found to be an expert in accounting and auditing. The trial court stated that his testimony was necessary for the understanding of both the court and the jury because of the complexity of the case.

Mr. Wheeler compared dollar amounts in certain invoices CCI sent the State for Ad Com work with corresponding invoice entries in State's Exhibit Number 24, a copy of a sheet in Ad Com's ledger. He pointed out specific discrepancies in the figures. Defendant raises no objection to that testimony to this Court.

The State auditor was then going to use State's Exhibit Number 45 to illustrate his testimony regarding the aggregate amount of CCI's overbilling to the State. That exhibit was a three-page chart prepared by Mr. Wheeler purporting to compare the total amount CCI billed the State for Ad Com work with the total amount CCI paid Ad Com for production work pursuant to the State contract. Another *voir dire* examination was conducted, and the court ruled that the testimony and use of the exhibit would be allowed.

In preparing State's Exhibit Number 45, Mr. Wheeler added all the checks from the State to CCI, which had been admitted into evidence at trial. He then added all the Ad Com invoices that were sent to CCI, which also had been introduced into evidence. The defendant had told Mr. Wheeler during the second audit of CCI that some of the Ad Com invoices included work done for CCI that was unrelated to the State contract. The auditor subtracted those amounts he concluded were unconnected to work done for North Carolina. Mr. Wheeler also deducted an amount totalling the monthly service charges between Ad Com and CCI for the period in question because the defendant had stated "that the $1,500 was a 5% agency service fee payable to Ad Com that was not in the bill to the State." The auditor also subtracted postage because he determined that it was not part of production costs. Defendant's objection is partly based on the fact that the auditor made these deductions. This argument is without merit.

An auditor is defined as "[a]n officer who examines accounts and verifies the accuracy of the statements therein;" an audit is "[a]n official examination of an account or claim, comparing vouchers, charges, and fixing the balance." BLACK'S LAW DICTIONARY 166-67 (Rev. 4th ed. 1968). An expert conducting an audit must regularly make the very types of conclusions of which defendant now complains. Determining whether a particular charge falls within a specific account is certainly within an auditor's area of expertise.

Apparently the defendant claims that because Mr. Wheeler did not actually *know* whether certain Ad Com charges were unrelated to the State contract or whether postage was not properly included in production costs, his testimony was incompetent. On the contrary, these determinations logically stemmed from Mr.

Wheeler's expertise and experience in auditing and accounting and from his own personal examinations of the documents. If some of his deductions were erroneous, the defendant had the opportunity to and actually did bring this fact to the attention of the jury during cross examination of Mr. Wheeler and during direct examination of his own witnesses.

Before Mr. Wheeler testified to these matters, the trial judge properly instructed the jury that State's Exhibit Number 45 was not direct evidence. He stated that it was "received solely for the limited purpose of illustrating and explaining the testimony of the witness and it is for you alone to say whether it does so." Furthermore, although the jury asked for and was given the exhibits to consult during its deliberation, with the consent of the State and defendant, State's Exhibit Number 45 was not included among them.

Defendant claims that the chart was overly prejudicial in that it "invited the jurors to disregard the assumptions made by the witness and concentrate on the bottom line figure." This assertion is belied by the fact that the jurors, instead of blindly accepting the total amount stated in the exhibit, returned verdicts of guilty in four of the substantive charges and not guilty in three of them.

[8] The defendant further objects that Mr. Wheeler based at least part of his testimony and State's Exhibit Number 45 on hearsay. This claim is controverted by the record.

It is well settled that an expert can base his opinion on his own personal knowledge and observations, *or* on evidence introduced at trial presented to the expert through a hypothetical question, or both. *See, e.g., State v. Holton,* 284 N.C. 391, 200 S.E. 2d 612 (1973). Mr. Wheeler admitted using several documents not in evidence to reach his conclusion as to CCI's total overbillings. The record indicates, however, that these materials were personally viewed and considered by him in his expert capacity. He testified to their existence and where he got them, to what they contained, and to how they were used in preparing State's Exhibit Number 45. "Since it is the jury's province to find the facts, the data upon which an expert witness bases his opinion must be presented to the jury in accordance with established rules of evidence." *Todd v. Watts,* 269 N.C. 417, 420, 152 S.E. 2d 448, 451

(1967). Mr. Wheeler's oral testimony was sufficient in this respect. This assignment of error is overruled.

[9] The defendant next contends the trial court erred in denying his motion as of nonsuit as to all the crimes with which he was charged. We do not agree.

In ruling on a motion as of nonsuit, it is beyond dispute that the evidence is to be considered in the light most favorable to the State, and the State is allowed every reasonable inference therefrom. *State v. Bell*, 285 N.C. 746, 208 S.E. 2d 506 (1974).

> "A motion for nonsuit of a charge of obtaining property by false pretense must be denied if there is evidence which, if believed, would establish or from which the jury could reasonably infer that the defendant (1) obtained value from another without compensation, (2) by a false representation . . . , (3) which was calculated and intended to decieve and (4) did in fact deceive." *State v. Agnew*, 294 N.C. 382, 387-88, 241 S.E. 2d 684, 688 (1978), *cert. denied*, ---- U.S. ----, 58 L.Ed. 2d 124, 99 S.Ct. 107 (1978).

The defendant claims the State failed to meet its burden of proving in both the conspiracy charge and in the substantive ones that there was a *false* representation. He argues there was no competent evidence introduced at trial that the bills CCI submitted to the State did not represent true production costs. This argument is without merit.

Under the State advertising contract, CCI was to be paid for production work purchased from outside sources "for actual amounts paid by the agency or in accordance with the prevailing rate for this type of work, whichever is lower." State's Exhibit Number 24 was admitted into evidence and identified by Toni Brennan as a copy of one of Ad Com's ledger sheets. She testified that in preparing the first set or "true" Ad Com invoices, she would assemble the invoices from other companies and give the compilation to Mr. Eng. He would then make up a bill, and she would type the invoice and enter the invoice number and amount in Ad Com's ledger. Thus, although the entries in State's Exhibit Number 24 cannot be used to show the true costs to the third party producers who actually performed the work, they can be used to show the amount CCI had to pay Ad Com for that work.

Those figures were different from the corresponding amounts CCI billed North Carolina. Therefore, there was sufficient evidence from which a jury could reasonably infer that false representations were made.

[10]   The defendant claims the State did not show that the defendant personally committed any crime because the allegedly false representations were made by CCI in its corporate capacity. This contention likewise is without merit.

The indictments charged and the trial judge properly instructed the jury that CCI was alleged to be the *alter ego* of the defendant. The evidence at trial showed that the defendant owned seventy-five percent of the stock of CCI; the other twenty-five percent was held in a blind trust for Stephen Crouch. The defendant was at all times the president and managing officer of the advertising company. There was testimony that the defendant was the person who ordered the inflated Ad Com invoices typed from State bills, and he and Mr. Eng decided to "milk" the State contract. The record is replete with evidence that CCI was run according to defendant's wishes.

> "[W]hen, as here, the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person." *Henderson v. Security Mortgage and Finance Co.*, 273 N.C. 253, 260, 160 S.E. 2d 39, 44 (1968). *See also State v. Salisbury Ice and Fuel Co.*, 166 N.C. 366, 81 S.E. 737 (1914).

This assignment of error is overruled.

For the foregoing reasons, the defendant had a trial free from prejudicial error. The decision of the Court of Appeals is

Affirmed.

Justices BRITT and BROCK did not participate in the consideration or decision of this case.