STATE OF NORTH CAROLINA v. MARIA DELORIS MONSERRATE

No. COA96-13

(Filed 7 January 1997)

1. **Searches and Seizures § 100 (NCI4th)— motion to suppress—search warrant—inconsistencies between affidavit and deposition testimony—exclusion of deposition—harmless error**

The trial court erred by excluding the deposition of an informant, now deceased, in a hearing on defendant's motion to suppress evidence seized from defendant's trailer pursuant to a search warrant where there were discrepancies between the informant's statements in the deposition and statements attributed to him in an SBI agent's affidavit in support of his application for the warrant since the deposition could be probative of bad faith on the part of the SBI agent and should have been considered by the trial court. However, the exclusion of the deposition was harmless error, even if the minor discrepancies from the deposition testimony contained in the SBI agent's affidavit were found to have been included in the affidavit as a result of exaggeration, reckless disregard, or even bad faith, where the affidavit's remaining content was sufficient to establish probable cause.

**Am Jur 2d, Searches and Seizures § 215.**

2. **Judges, Justices, and Magistrates § 26 (NCI4th)— suppression hearing—judge who issued warrant—recusal not required**

The trial judge did not err in failing to recuse himself from a suppression hearing where the judge issued the search warrant and presided over a hearing to suppress evidence seized pursuant to the search warrant. There is no statutory or constitutional proscription in North Carolina against a judge's presiding at a hearing to review the validity of a search warrant issued by that judge although it is the better practice to allow a different judge to rule upon the validity of such a warrant. Further, Canon 3(C)(1)(a) of the Code of Judicial Conduct does not require the trial judge to recuse himself.

**Am Jur 2d, Judges §§ 86, 88.**

STATE v. MONTSERRATE

[125 N.C. App. 22 (1997)]

Disqualification of judge for bias against counsel for litigant. 23 ALR3d 1416.

Waiver or loss of right to disqualify judge by participation in proceedings—modern state civil cases. 24 ALR4th 870.

Disqualification of judge because of assault or threat against him by party or person associated with party. 25 ALR4th 923.

3. Criminal Law § 1246 (NCI4th Rev.)— sentencing—mitigating factor—minor or passive role—failure to find not error

The sentencing court's failure to find as a mitigating factor for kidnapping and burglary that defendant played a minor role or was a passive participant in the commission of those offenses did not constitute error where the evidence presented at trial showed that defendant recruited her son to assist in the acts, she drove her car to pick up the victims, and she did not let the victims go when they were bound and gagged in the defendant's trailer.

Am Jur 2d, Criminal Law §§ 525 et seq.

4. Criminal Law § 1297 (NCI4th Rev.)— mitigating factor— good character—no error in failure to find

It was not error for the sentencing court to decline to find as a mitigating factor for murder, kidnapping and burglary that defendant was a person of good character where the sole evidence regarding defendant's character and reputation was by defendant and defendant's daughter. The credibility of this evidence is a matter for the determination of the trial court; the court has the discretion to reject testimony of biased witnesses. N.C.G.S. § 15A-1340.4(a)(2)m.

Am Jur 2d, Criminal Law §§ 525 et seq.

5. Criminal Law § 1156 (NCI4th Rev.)— sentencing—no merit —no consideration of dismissed charges

There was no merit to defendant's argument that the sentencing court considered dismissed charges as a nonstatutory aggravating factor in sentencing the defendant who had pled guilty to murder, burglary and kidnapping charges. Though the court remarked about the charges which had been dismissed, formal findings were made in aggravation and mitigation of punish-

STATE v. MONTSERRATE

[125 N.C. App. 22 (1997)]

ment and the record does not affirmatively disclose that the court enhanced defendant's sentence based on dismissed charges.

**Am Jur 2d, Criminal Law §§ 525 et seq.**

Appeal by defendant from judgments entered 29 March 1995 by Judge James R. Strickland in Onslow County Superior Court. Heard in the Court of Appeals 21 October 1996.

*Attorney General Michael F. Easley, by Assistant Attorney General Jill Ledford Cheek, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Janine M. Crawley for defendant-appellant.*

MARTIN, John C., Judge.

By true bills of indictment dated 7 January 1992, defendant was charged with the first degree kidnappings and first degree murders of Phyllis Aragona and Scott Allen Gasperson. By true bill of indictment dated 19 July 1994, defendant was also charged with second degree burglary of Scott Gasperson's dwelling, felonious larceny, and felonious possession of stolen goods. All of the crimes were alleged to have been committed on 12 July 1990.

After the denial of her pre-trial motion to suppress evidence obtained as a result of a search of a mobile home in which she resided at the time of the crimes, defendant entered guilty pleas to two counts of second degree murder, two counts of first degree kidnapping and one count of second degree burglary. The terms of her plea agreement included the State's agreement to dismiss, with prejudice, three drug charges; numerous charges of felonious larceny and possession of stolen property relating to the automobiles of Phyllis Aragona and Scott Gasperson; charges of felonious breaking and entering, felonious larceny, and felonious possession of stolen properties relating to the pawn shop managed by Scott Gasperson; and a safecracking charge relating to the pawn shop.

The district attorney summarized the evidence for the State with the consent of defendant. The State's summary of the evidence tended to show that on 12 July 1990 a break-in was discovered at the Woodson Music and Pawn Shop, which was managed by Scott Gasperson, in Jacksonville. In their investigation, police officers discovered that Mr. Gasperson's residence, located at 432 Ben Williams Road in Jacksonville, had also been broken into and that Mr.

Gasperson and his fiancee, Phyllis Aragona, were missing, along with their two vehicles. On 12 July 1990 around 5:00 p.m., Mr. Gasperson's body was found in his car on a road outside of town. He had been shot in the back of the head. On 7 April 1991 a body was found in Pender County; this body was later identified as Phyllis Aragona. She too had been shot.

Approximately one week after the crimes were committed, officers obtained a search warrant and went to Lot 41 of Pelletier Mobile Home Park in Jacksonville where defendant resided, along with her son Eli Ocasio, her boyfriend Gary Fernandez, and Gary's son Orlando Fernandez. Evidence seized from the trailer included the screwdriver which had been used to pry open the door at Mr. Gasperson's residence; two towels which had AB-type blood on them, matching Mr. Gasperson's blood type; a charred business card from the pawn shop; bullets which were similar to a shell casing found near the remains of Phyllis Aragona in Pender County, and which also were similar to the bullet found in Ms. Aragona's skull; two types of duct tape which matched the duct tape found at Woodson Music and Pawn, at the victims' residence, on the body of Scott Gasperson, and at the scene in Pender County where the remains of Phyllis Aragona had been discovered; and toboggans which had been made into "homemade type hoods" similar to one which was found near the body of Scott Gasperson. Officers in Miami, Florida, located a 1980 Thunderbird which belonged to Gary Fernandez and in which they found another toboggan which had been converted into a hood. Police also found comic books belonging to Mr. Gasperson, one of which had Orlando Fernandez's fingerprints. Police officers also searched a storage bin rented to co-defendant Orlando Fernandez. This search disclosed duct tape, a tennis bag belonging to Scott Gasperson, and items stolen from Mr. Gasperson's residence. Following his arrest, Gary Fernandez led police to the location of a shotgun, which also had been stolen from Mr. Gasperson's residence.

Co-defendant Eli Ocasio made a statement to police in which he admitted that defendant, his mother, drove him, Gary Fernandez, and Orlando Fernandez to Scott Gasperson's home on the night of 11 July 1990. The three men entered the home, restrained Mr. Gasperson and Ms. Aragona with duct tape, and stole items from the home. The victims were then loaded into Ms. Aragona's Chevrolet Blazer and transported by Gary Fernandez to Lot 41, Pelletier Mobile Home Park. Defendant drove Eli Ocasio and Orlando Fernandez back to the trailer. Gary Fernandez instructed Eli to watch the victims in a bed-

room in the trailer; defendant was also present with Eli and the victims. Gary Fernandez left with Scott Gasperson, returned without him, and told Eli that Mr. Gasperson was dead. The following morning Gary attempted to return Ms. Aragona to her residence, but saw police outside and did not stop. Gary returned to the trailer without Ms. Aragona. All of the co-defendants left later that night for Miami, Florida. On the way, at a location near where Ms. Aragona's remains were later found, Gary stopped his car and ran into the woods. Eli heard a gunshot. Gary returned to the car carrying some blankets. When Eli noticed blood on the blankets, Gary directed him to throw them out of the car.

At the sentencing hearing, the State introduced arrest warrants and release orders showing that defendant had been charged with multiple drug offenses in March 1990. When the instant crimes occurred, defendant was out of jail under bond for the March charges.

Defendant's daughter, Janette Ocasio, testified that on 4 July 1990 defendant approached her about driving to a location and dropping off defendant, Gary, and Orlando Fernandez. She refused to do so. On the day of the murders, defendant, Gary, and Orlando Fernandez picked her up from work and went to a storage bin. Defendant told Janette that defendant, Gary, Orlando, and Eli were going to Miami because they had committed a robbery and were worried someone had seen them. Several days later Janette and defendant spoke by telephone; defendant wanted to know if anything was going on in Jacksonville and if anybody was looking for them.

Defendant testified on her own behalf. She gave detailed testimony concerning the crime. She acknowledged that she had driven Gary, Orlando, and Eli to Mr. Gasperson's residence on 11 July 1990. She was aware that Gary planned to break into Mr. Gasperson's pawn shop and believed the purpose of the trip to Mr. Gasperson's residence was to obtain information about the pawn shop. Gary Fernandez told defendant that the proceeds from the pawn shop robbery were necessary to pay lawyers' fees for the drug charges, and that they would go to prison on the drug charges if they could not pay their lawyers. Defendant saw Gary leading the bound victims out of the house, but when she asked him what he was doing, he told her not to ask questions. Gary drove the victims to the trailer; defendant followed with Eli in her own car.

Defendant went on to explain that she was in the trailer with Eli and the victims. Gary and Orlando were gone for some period of time

STATE v. MONTSERRATE

[125 N.C. App. 22 (1997)]

during the night and Eli watched the victims; defendant had no interaction with the victims. She did not let them go because she and Gary needed the money to pay their attorney and she believed Gary would not harm the victims. Early the next morning, defendant drove Gary to the pawn shop. Gary entered the store briefly, returned to the car, and waited to see if police would come. Defendant and Gary then returned to the trailer. Gary left again with Mr. Gasperson in Mr. Gasperson's car. Defendant believed that Mr. Gasperson was going to open the pawn shop safe and then Gary would let Mr. Gasperson and Ms. Aragona go. She was too nervous to stay at the trailer, so she drove back by the pawn shop as Gary and Orlando were leaving. Gary threw a bag of jewelry into defendant's car, placed Mr. Gasperson in the back seat of Mr. Gasperson's car, and beckoned defendant to follow him. Defendant followed him until he waved her on and turned down a dirt road. Defendant was lost and continued to drive slowly down the paved road. She saw Gary and Orlando running towards her, so she backed up and picked them up. Gary told her that they had left Mr. Gasperson tied up in the woods with his car and that someone would soon find him because the car was visible from the road. Defendant believed the victim was unhurt.

When they returned to the trailer, Gary told defendant that he was going to take Ms. Aragona home. He returned alone two hours later. When she asked about the victim, Gary assured her that the victim had been returned home. Later that evening, Gary announced that they were all going back to Miami. Early in the trip, Gary pulled off the road, ran into the woods, and returned with a blanket that defendant had seen wrapped around Ms. Aragona. She again inquired about Ms. Aragona's whereabouts and was told by Gary that he had left her in the woods. He assured her the victim would be found.

Defendant called her daughter from Miami and learned that Scott Gasperson was dead. Gary arranged for the family to flee to the Dominican Republic. While there, defendant supported the family, and Gary took all the money defendant earned. At some point, defendant attempted to escape from Gary, but he found her and brought her back. Defendant said she was relieved to be arrested and extradited to North Carolina.

At the conclusion of her direct testimony, defendant read a prepared statement which said in part that she never thought Gary was going to kill anyone. She went on to say she was afraid and scared when she found out, and she accepts her guilt. She asked the community to forgive her.

STATE v. MONTSERRATE

[125 N.C. App. 22 (1997)]

On cross-examination, defendant testified that Gary Fernandez had told her, and she believed, that he was working for the FBI. She denied being involved in any drug dealing and denied knowledge that Gary was selling drugs. The drug charges arose in March 1990, when defendant drove Gary "to go and see some friends."

The sentencing court found as an aggravating factor that defendant had committed the offenses while on pretrial release on another felony charge. The court found as a mitigating factor that defendant had no record of prior criminal convictions. In the two murder cases the trial court found as mitigating factors that defendant was a passive participant and played a minor role in the commission of the offenses. The court found that the aggravating factor outweighed the mitigating factors in each of the cases and imposed consecutive life sentences upon each conviction of second degree murder, consecutive forty year sentences upon each conviction of first degree kidnapping, and an additional consecutive forty year sentence upon the conviction of second degree burglary. Defendant appeals.

---

On appeal, defendant contends that she is entitled to a new sentencing hearing because the trial court erred (1) by failing to find as a mitigating factor that defendant played a minor role or was a passive participant in the commission of the kidnappings and burglary, (2) by failing to find as a mitigating factor in all cases that defendant was a person of good character, and (3) by improperly considering as an aggravating factor the nature of the charges which the prosecutor dismissed as part of defendant's plea agreement. In addition, defendant acknowledges that she failed to properly preserve for appeal issues relating to the denial of her pretrial motion to suppress evidence, and has petitioned for a writ of *certiorari* in which she seeks review of the following alleged errors: (1) the trial court erred by failing to admit the deposition of Miguel Guzman into evidence at the hearing on defendant's motion to suppress evidence seized from the mobile home where defendant had resided, when this evidence was critical to the resolution of defendant's *Franks v. Delaware* claim, and (2) the trial judge erred by failing to recuse himself from hearing the motion to suppress the evidence seized from the mobile home, since the judge had issued the search warrant. Defendant contends that, because of these errors, this Court should vacate defendant's guilty pleas and remand the case for a new trial. Both defendant and the State have briefed the issues raised by defendant's petition for writ of *certiorari*; in our discretion we grant the petition and address

the issues on their merits. We affirm the denial of defendant's motion to suppress and the sentences imposed by the trial court.

## Issues reviewed upon *Certiorari*

[1] Defendant filed a pretrial motion to suppress evidence seized after a search, pursuant to a search warrant, of her trailer at Lot 41 Pelletier Mobile Home Park. She alleged that significant portions of the affidavit supporting the application for the search warrant were knowingly false or made in reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 57 L.Ed.2d 667 (1978); N.C. Gen. Stat. § 15A-978. In particular, defendant alleged that the statements in the affidavit attributed to Miguel Guzman were knowingly false. Prior to the motion hearing, Mr. Guzman died, and defendant proffered as evidence his deposition which had been taken in preparation for trial. The State objected to the admission of the deposition on the grounds of relevance, and the trial court sustained the objection and excluded the deposition. Defendant argues that there were significant discrepancies between Mr. Guzman's statements in the deposition and the statements attributed to him in an affidavit by SBI Agent Cummings in support of his application for a search warrant. Defendant contends that the deposition is probative of bad faith on the part of Agent Cummings and should have been admitted.

In the application for search warrant, Agent Cummings stated:

On Tuesday July 17, 1990 at approximately 3:45 pm Detective Mack Whitney of the Onslow Co. Sheriff's Dept. was contacted by Miguel Angel Guzman Hispanic Male, DOB: 09-03-44 and was advised of the following facts: That approximately 3 months ago Guzman was told personally by Orlando Fernandez w/m DOB: 3-10-72 and Gary Fernandez w/m DOB: 03-15-52 that they were surveilling the Woodson Music and Pawn Shop at 18 Hwy. 24 Piney Green, Jacksonville, NC for the purpose of robbing the shop because it opened at 9:00 am and there would not be many persons in the area. On or about the first of July 1990, Guzman was again contacted by Orlando and Gary Fernandez and advised that they were personally going to rob the Woodson Music and Pawn at 18 Hwy. 24, Piney Green, Jacksonville, NC and solicited Guzman's assistance in the commission of the robbery. Guzman refused and was again contacted by Orlando and Gary Fernandez on Thursday July 12, 1990 at approximately 9:00 am.

Both Orlando and Gary Fernandez were acting in a suspicious and nervous manner and they requested Guzman to secure and

keep 1 large amount of gold jewelry for them. Guzman refused to hold the gold jewelry and Orlando and Gary Fernandez told Guzman that they would be leaving for Miami, FLA soon and quickly departed the scene. The Fernandez's were operating a small red vehicle and Gary Fernandez was attired in a red knit type shirt and stone washed slacks, with grey-white canvas type athletic shoes. Orlando was also wearing an athletic type shoe and according to the Fernandez's they would carry camouflage type clothing to wear during the commission of the robbery. Orlando and Gary Fernandez told Guzman on Friday July 13, 1990 where to find the key to their mobile home and told Guzman that he could remove all the furniture from their residence and upon their return Guzman could pay them $100.00 for all the furniture.

On Wednesday July 18, 1990 Guzman told your affiant that the Fernandez's were residing at the Pelletier Mobile Home Park located at 1673 Marine Blvd. Jacksonville, NC.

In the order denying defendant's motion to suppress, the trial court made the following findings of fact: that the information in the affidavit attributed to Miguel Guzman was related to Agent Cummings by other investigating officers who were interviewing Mr. Guzman, that Agent Cummings set out the information in the search warrant affidavit truthfully and accurately based upon information he had first hand or that had been provided to him, and that there was no evidence before the Court that any law enforcement officer had given information for the search warrant affidavit which was knowingly and intentionally false or provided with reckless disregard for the truth. The court found that to the extent there were any factual inaccuracies, they were minor in nature and resulted from innocent mistakes. The court concluded as a matter of law that defendant had not established by a preponderance of the evidence that any of the statements in the search warrant affidavit were knowingly and intentionally false or that they were made with a reckless disregard for the truth.

There is a presumption of validity with regard to an affidavit supporting a search warrant. *Franks v. Delaware*, 438 U.S. 154, 57 L.Ed.2d 667 (1978). Where, however, defendant makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, he is entitled to a hearing at

his request. *Id.* Defendant may contest the truthfulness of the affiant's testimony by cross-examination or by offering evidence. N.C. Gen. Stat. § 15A-978. In this case, defendant was granted a hearing, but Miguel Guzman's deposition, which was offered by the defense as evidence of bad faith, was not admitted because the court found it was not relevant to the issue of bad faith.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. There were inconsistencies between the testimony given by Mr. Guzman in his deposition and the statements attributed to him by Agent Cummings in the affidavit. In his deposition, Mr. Guzman made no mention of being contacted by Gary or Orlando on 1 July 1990. However, he did hear Gary and Orlando discuss the robbery on two or three occasions. He also heard them discuss abducting the owners from their house and taking them to Woodson's Music and Pawn Shop. In his deposition, Mr. Guzman said Gary and Orlando drove up to his house the morning of the robbery, but that they did not speak. Mr. Guzman stepped outside to see who it was, then went inside to get clothes on, and when he returned they had left. He did not see what they were wearing. Also in his deposition, Mr. Guzman stated that Gary told him about a month and a half before the robbery that he could remove any furniture he wanted and pay him $100 later.

Although there may be explanations for these inconsistencies, the fact that the inconsistencies exist means the deposition has a tendency to make the existence of certain facts less probable. Thus, the deposition could be probative of bad faith on the part of Agent Cummings and should have been admitted into evidence. The question of whether the deposition does, in fact, show bad faith is a separate issue, which can be addressed only after the deposition is considered. Accordingly, the trial court erred in failing to admit and consider Mr. Guzman's deposition.

The error in the exclusion of the deposition is, however, harmless. In his deposition, Mr. Guzman admitted that he overheard Gary and Orlando Fernandez discussing robbing the pawn shop three months ahead of time, and he made the connection that they were the ones who robbed the pawn shop. He also admitted that Gary and Orlando had tried to get him to participate. Mr. Guzman explained in his deposition that he turned Gary and Orlando in to the police

because he feared for his life. Thus, even if the deposition had been considered and the minor discrepancies noted between Agent Cummings' affidavit and Mr. Guzman's testimony in his deposition were found to have been included in the affidavit as a result exaggeration, reckless disregard, or even bad faith, the affidavit's remaining content is sufficient to establish probable cause. *See Franks, supra; State v. Louchheim,* 296 N.C. 314, 250 S.E.2d 630, *U.S. cert. denied,* 444 U.S. 836, 62 L.E.2d 47 (1979), *State v. Winfrey,* 40 N.C. App. 266, 252 S.E.2d 248, *disc. review denied,* 297 N.C. 304, 254 S.E.2d 922 (1979).

**[2]** Defendant also asserts that because the trial judge had issued the search warrant upon the application of Agent Cummings, he should have recused himself from presiding over the suppression hearing which sought to have it declared invalid. Defendant contends that, by issuing the search warrant, the judge vouched for the veracity of the affidavit, and thus was not in a position to impartially determine the veracity of the affidavit in a later suppression hearing. We disagree.

In issuing the search warrant, a judge does not vouch for the veracity of the affidavit given in support thereof; he simply determines that the information in the affidavit is sufficient to provide probable cause to believe that the informant was giving truthful information. *See Illinois v. Gates,* 462 U.S. 213, 76 L.Ed.2d 527 (1983). We agree.

> Upon a motion that a judge recuse himself, the burden is upon the movant to "demonstrate objectively that grounds for disqualification actually exist. Such a showing must consist of substantial evidence that there exists such a personal bias, prejudice or interest on the part of the judge that he would be unable to rule impartially."

*State v. Honaker,* 111 N.C. App. 216, 219, 431 S.E.2d 869, 871 (1993) (citation omitted).

This Court held in *State v. Brown,* 20 N.C. App. 413, 201 S.E.2d 527, *appeal dismissed,* 285 N.C. 87, 204 S.E.2d 21 (1974), that "[t]here is no statutory or constitutional proscription in North Carolina against a judge's presiding at a hearing to review the validity of a search warrant issued by that judge." Although the Court observed that "it is the better practice to allow a different judge to rule upon the validity of such a warrant," *Id.* at 414, 201 S.E.2d at 528, it does not require a different judge to rule upon the validity of a search war-

rant. Nor do we agree that Canon 3(C)(1)(a) of the Code of Judicial Conduct, which states: "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," required the trial judge to recuse himself. *See Holloway v. State*, 293 Ark. 438, 738 S.W.2d 796 (1987) (Canon 3(C)(1)(a) does not require recusal when the judge has obtained knowledge of the facts of the case from previous proceedings in that case); *Hawkins v. State*, 586 S.W.2d 465 (1979) ("a trial judge who initially issues a search warrant is not thereafter so interested in the cause as to be disqualified" from presiding over the suppression hearing); *People v. Tariq*, 565 N.Y.S.2d 614 (A.D. 3 Dept. 1991) (there is no reason to prohibit the judge who issued a warrant from entertaining a motion to suppress evidence seized pursuant to it, and there is always appellate review); *Castillo v. State*, 761 S.W.2d 495 (Tex.App.—Waco 1988), *affirmed*, 810 S.W.2d 180 (1990) (court rejected defendant's argument that it was improper for the judge who issued the search warrant to preside over the motion to suppress evidence derived from the warrant). We conclude the judge did not err in failing to recuse himself from the suppression hearing.

## Issues reviewed upon direct appeal

[3] With respect to her sentences for kidnapping and burglary, defendant contends the trial court erred in failing to find as a mitigating factor that defendant played a minor role or was a passive participant in the commission of those offenses. She contends the evidence supporting the existence of the factor was uncontradicted and manifestly credible, requiring the court to find their existence. We disagree.

It is the duty of the trial judge to examine the evidence to determine whether it would support any statutory factor in mitigation of punishment, even in the absence of a request by defense counsel. *State v. Cameron*, 314 N.C. 516, 335 S.E.2d 9 (1985). The defendant must prove the presence of a mitigating factor by a preponderance of the evidence. *State v. Canty*, 321 N.C. 520, 364 S.E.2d 410 (1988). The trial judge must consider any statutory mitigating factor where the evidence in support of the factor is uncontradicted and substantial, but the judge can attribute whatever weight he deems appropriate to the individual factors found when balancing them and arriving at a prison term. *State v. Jones*, 309 N.C. 214, 306 S.E.2d 451 (1983).

[W]hen a defendant argues . . . that the trial court erred in failing to find a mitigating factor proved by uncontradicted evidence, . . . [h]e is asking the court to conclude that "the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn" and that the credibility of the evidence "is manifest as a matter of law."

*Id.* at 219-220, 306 S.E.2d at 455 (citations omitted). It is not error for a sentencing judge to fail to find a mitigating factor if uncontradicted, substantial and manifestly credible evidence is not probative of the mitigating factor sought to be established. *State v. Blackwelder,* 309 N.C. 410, 306 S.E.2d 783 (1983).

There was evidence that defendant was aware of the planned burglary a week or two before it occurred, and agreed because she and Gary Fernandez needed the money to pay their attorney so that they could avoid going to prison on drug charges. Additionally, defendant successfully solicited the participation of her son Eli and unsuccessfully solicited the participation of her daughter Janette. In conformity with the plan, defendant drove Gary, Orlando, and Eli to the victims' house after dark and dropped them off. When she returned to pick them up a few hours later and found no one waiting for her, she went up to the house and knocked. The three men were bringing Scott Gasperson and Phyllis Aragona out of the house, and the victims' eyes, hands, and mouth were taped.

The three men and defendant returned to the trailer with the victims still bound and gagged. Gary and Orlando returned to the victims' residence and left Eli and defendant behind with the victims, who sat in the bedroom of the trailer. Defendant did not let them go at this time. She testified that it was because she did not think anyone would get hurt, and she and Gary needed money to pay their attorney. This evidence refutes a finding that defendant was a passive participant or played a minor role in either the burglary or the kidnappings, and we affirm the decision of the trial court.

**[4]** Defendant also contends the trial court erred in declining to find as a mitigating factor that defendant was a person of good character. G.S. § 15A-1340.4(a)(2)m establishes as a mitigating factor that "[d]efendant has been a person of good character or has had a good reputation in the community in which (s)he lives."

Defendant testified that she had come from a disadvantaged background, had been abandoned by her parents and had been

abused by her custodian, had had no educational opportunities and had worked from an early age. She had married for the first time at the age of fourteen and had given birth to two children. Her first marriage terminated; she subsequently married a Marine, moved to Jacksonville, and had a third child. Although defendant's second husband left her, she worked multiple jobs, supported her chronically ill mother as well as her children, and earned a GED.

Defendant married for a third time in 1986, and moved to Florida. The marriage lasted only six months. She met Gary Fernandez and they eventually moved to Miami together. Gary would disappear for days and sometimes weeks at a time, and told defendant he was working for the FBI. After a three week absence, he reappeared and told defendant he had moved to Jacksonville, North Carolina. At his request, defendant agreed to move back to Jacksonville. She then became aware of Gary's criminal activities dealing in stolen property.

Defendant's daughter, Janette Ocasio, testified that defendant was generous toward her family and was a devoted parent. The family had never had a bad Christmas, and she could not remember a time when there were not family members living with them.

The sole evidence presented in this case regarding defendant's character and reputation was presented by defendant and her daughter. The credibility of this evidence is a matter for the determination of the trial court; the court has the discretion to reject testimony of biased witnesses. *See State v. Russell*, 92 N.C. App. 639, 376 S.E.2d 458 (1989) (where sole evidence as to good reputation came from defendant's mother, trial court did not err in declining to find as a mitigating factor that defendant had a good reputation in the community); *State v. Taylor*, 309 N.C. 570, 308 S.E.2d 302 (1983) (the relationship of the witnesses to defendant is a factor which the fact finder may consider in assessing witness credibility); *State v. Smallwood*, 112 N.C. App. 76, 434 S.E.2d 615 (1993) (no error in declining to find good reputation as a mitigating factor where evidence presented showed defendant was "a very respectable person all his life" and was "a very good boy"); *State v. Greenspan*, 92 N.C. App. 563, 374 S.E.2d 884 (1989) (although the testimony was uncontradicted evidence of defendant's good character, it was not so manifestly credible as to require the trial court to find it as a mitigating factor). In the present case, the credibility of the evidence is not manifest as a matter of law and reasonable inferences inconsistent with the existence of the mitigating factor contended for by defendant can be drawn. Therefore,

the trial court did not err in declining to find as a mitigating factor that defendant was a person of good character.

[5] Finally, defendant contends the sentencing court erred by improperly considering as an aggravating factor the nature of the charges which the prosecutor dismissed as part of defendant's plea agreement. Defendant concedes that the sentencing court did not formally find, as a non-statutory aggravating factor, that certain charges had been dismissed pursuant to a plea agreement, but argues that the court improperly considered the dismissed charges in determining defendant's sentence. We find no merit to this argument. Though the court remarked about the charges which had been dismissed, formal findings were made in aggravation and mitigation of punishment and the record does not affirmatively disclose that the court enhanced defendant's sentence based on dismissed charges. *See State v. Westall,* 116 N.C. App. 534, 449 S.E.2d 24, *disc. review denied,* 338 N.C. 671, 453 S.E.2d 185 (1994) (record does not affirmatively disclose that the trial court enhanced defendant's sentence due to the pending charges, thus no error); *State v. Mack,* 87 N.C. App. 24, 359 S.E.2d 485 (1987), *disc. review denied,* 321 N.C. 477, 364 S.E.2d 663 (1988) (same).

The judgments of the trial court are, in all respects, affirmed.

Affirmed.

Judges EAGLES and SMITH concur.